### SOUTHERN RY. CO. et al. v. EDWARDS.
### No. 5943.

Circuit Court of Appeals, Fifth Circuit.
Nov. 14, 1930.

Rehearing Denied Dec. 5, 1930.

S. P. Smith, of Birmingham, Ala., and S. T. Wright, of Fayette, Ala. (Stokely, Scrivner, Dominick & Smith, of Birmingham, Ala., on the brief), for appellants.

Oliver D. Street and W. L. Longshore, both of Birmingham, Ala. (O. D. Street & Son, all of Birmingham, Ala., on the brief), for appellee.

Before BRYAN and WALKER, Circuit Judges, and HOLMES, District Judge.

WALKER, Circuit Judge.

This was an action by the appellee, the administratrix of the estate of R. L. Edwards, deceased, against the appellants, Southern Railway Company and W. P. Brown & Sons Lumber Company, to recover damages for the death of the deceased, which was attributed to the alleged negligent failure of the appellants to warn the consignee or the deceased, an employee of the consignee, of the alleged danger to the consignee or any person attempting to unload a carload of telephone poles resulting from the standards or stakes used on the sides of that car being too few or too weak. At the conclusion of the evidence, the court refused to give requested charges to the effect that, if the jury believed the evidence, they should not find in favor of the plaintiff.

The evidence showed the following: The W. P. Brown Lumber Company shipped a carload of telephone poles from a point on the Mobile & Gulf Railroad to the American Telephone & Telegraph Company at Irondale, Ala. That car was received by the Southern Railway Company at a station on its line, and that carrier transported the car from that station to Irondale. The poles, which were about 30 feet long and from 10 to 11 inches in diameter at the butt end, were loaded on a flat car by the shipper; a crane being used to pick up the poles and put them on the car, the small ends and butts being alternated so as to keep the load even. For side support, four timber standards or stakes were used on each side of the car, though on each side there were twelve cuffs or pockets where standards might have been put. The standards fitted into cuffs, and were from 4 to 5 inches in diameter, being cut square at the ends which fitted in the cuffs. When the car was about half loaded, four strands of wire of eight wrappings each were run across from the standard on one side to the standard immediately opposite on the other side, thus tying together the standards on opposite sides of the car. Those wires were drawn tight, and were made tighter by the weight of the poles loaded above them. When the load was completed, four more strands of wire of eight wrappings each were run across the top of the load and fastened in the same manner to standards on opposite sides, except that the top wires were fastened together and pulled tight with a piece of iron. A wedge was placed between each of the

stakes or standards and the side of the car, so as to incline the stakes inwardly at the top. When the car reached Irondale, it was placed for unloading on a track running east and west. At that time the load on the car was as it was when it started on its journey, except that it was leaning a little towards the south, on which side the poles were to be unloaded. The deceased was an employee of the consignee, and with a coemployee undertook to unload the car. Wishing the poles to fall on the south side, they cut the standards on that side by sawing them about half through above the cuffs. While the deceased was engaged in cutting with an axe the top wires on the north side, and after he had cut two of those wires, there was a crash, and poles fell on both sides, with the result that the deceased was killed by poles hitting him. Before the unloading began, Mr. Otwell, an agent of the consignee who employed the deceased, had a conversation with the deceased as to the way to proceed in unloading the poles, in which he suggested to the deceased to cut the wires on the side he wanted the poles to fall on. Before cutting the wires the deceased and his coemployee who was taking part in the unloading talked about how the wires should be cut. In that conversation the deceased stated what Mr. Otwell had told him was the safe way to unload the poles. The deceased and his coemployee decided that the safest way to do was to cut the wires, not on the south side towards which the load was leaning and on which they wished the poles to fall, but on the other side.

■ The condition which gave rise to danger to persons who might undertake the unloading of the car was open and visible, and any danger or risk therefrom to the deceased was one which, as between the deceased and his employer, was assumed by the former. Mc-Millan v. Spider Lake S. M. & L. Co., 115 Wis. 332, 91 N. W. 979, 60 L. R. A. 589, 95 Am. St. Rep. 947, 18 R. C. L. 689. In the argument reference was made to decisions to the effect that a carrier by railroad owes a duty to a consignee or his employee having the task of unloading to give warning to such persons of a danger to them due to the condition of the car containing the goods shipped or to the way those goods were stowed, which was unknown to such persons, but was either known to the carrier or would have been known to it if the duty of proper inspection had been complied with. Such decisions are not applicable to the facts of this case. We are aware of no valid reason for holding that a carrier is under a duty to give notice or warning of a condition which is so visible that any danger therefrom must be apparent to and appreciated by a person of ordinary intelligence, prudence, and experience who undertakes the unloading of a car.

■ Whatever danger there was to one undertaking to unload the poles from the car, due to their condition when they were ready to be unloaded, was of a kind as likely to be appreciated by a person of ordinary intelligence, prudence, and experience who might reasonably be expected to take part in the unloading as to any one acting for the shipper or the carrier. It is apparent from the evidence that the deceased realized that there was some danger to him in attempting the unloading in the way adopted. It seems that it may be inferred that that danger might have been avoided by putting suitable side supports in the cuffs which had been left vacant on the side on which poles were not intended to fall, by bracing the load on that side with a prop or props resting on the ground, or by breaking or cutting the wires by the use of some instrument operated at a safe distance from falling poles. But, whether there was or was not a practicable way of avoiding that danger, the deceased was negligent in incurring a danger which was open and apparent. That danger was brought into play by deceased's own voluntary act, done with full knowledge of the situation dealt with and that it involved peril. We conclude that evidence without conflict showed that the negligence of the deceased caused or proximately contributed to his injury and death, with the result of barring the asserted right of recovery. Anderson v. Southern Ry. Co. (C. C. A.) 20 F.(2d) 71.

The above mentioned rulings were erroneous. Because of those errors, the judgment is reversed, and the cause is remanded, with direction that a new trial be granted.

Reversed.