## PHILADELPHIA TITLE INS. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10756.

United States Court of Appeals Third Circuit.

Argued Oct. 16, 1952.

Decided Oct. 22, 1952.

## FISHER v. MINNEAPOLIS & ST. L. RY. CO. et al.

### No. 14500.

United States Court of Appeals Eighth Circuit.

Oct. 21, 1952.

John H. Mitchell, Ft. Dodge, Iowa (Edward D. Kelly, Harold F. Fristedt, Algona, Iowa, and Philip C. Lovrien, Humboldt, Iowa, were with him on the brief), for appellant.

Maxwell A. O'Brien, Des Moines, Iowa (Parrish, Guthrie, Colflesh & O'Brien, Des Moines, Iowa, were with him on the brief), for appellee Graybar Electric Co., Inc., of New York.

William J. Powell, Minneapolis, Minn. (C. W. Wright, Richard Musenbrock, and George M. Stephenson, Minneapolis, Minn., were with him on the brief), for appellee Minneapolis & St. L. Ry. Co.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This action was brought by the qualified administratrix to recover damages for the death of Raymon Edward Fries, alleged to have been caused by negligence of the only defendants in the action at the time of trial, namely, the Graybar Electric Company, Inc., and the Minneapolis and St. Louis Railway Company. There was federal jurisdiction by reason of diversity of citizenship and amount involved and at the conclusion of all of the evidence on the jury trial of the case each of the defendants moved the court for directed verdict. The court granted the motions and entered judgment of dismissal on the verdict in favor of defendants. The plaintiff has appealed from the judgment.

It appears without dispute that the death of plaintiff's decedent occurred while he was working as one of a crew of five men engaged in unloading a shipment of large transmission line poles from railroad flat cars at Gilmore City, Iowa. There were 38 poles in the shipment, 55 feet in length and weighing 101,300 pounds, about 3,000 pounds apiece. They formed an installment of a large quantity of light and power poles and other materials which the Graybar company had contracted to sell to an Iowa co-operative association called Cornbelt Power Co-Operative. The Graybar company in turn had bought the poles from American Creosote Works, Inc., to be delivered on board the cars at the point to which shipment was to be made, and that company had loaded them on two flat cars at Louisville, Mississippi, and there delivered them to the Gulf, Mobile & Ohio railroad for transportation to the Cornbelt Power Co-Operative at Gilmore City, notifying the co-operative of the shipment. The initial carrier transferred the cars of poles to defendant M. & St. L. railroad which transported them to Gilmore City and notified the Cornbelt when the cars were spotted for unloading. The

Cornbelt accepted the shipment and arranged with another co-operative, the Humboldt County Rural Electric Co-Operative as an independent contractor to unload the poles. That co-operative then took exclusive charge of the unloading. It sent a crew of five of its employees, including plaintiff's decedent and Heike Tjaden, its gang foreman, to Gilmore City to do the job with a boom truck carrying a winch and cable on the back of it and their "ordinary tools".

Arriving at Gilmore City all the men studied the load and observed the means by which the poles were, and throughout the transportation had been, held together in a safe and ordered pile on the two flat cars. Such means were all in plain sight, open and apparent. A timber of about ten by ten inches was attached across the width of the floor of each flat car for a bolster on which the ends of the bottom poles were rested to avoid friction of the load against the car floors on uneven or curving road beds. The poles were piled to a height of a little more than six feet alternating the butts and upper ends to keep the load even, and the pile was fastened together by three strong metal bands 2 inches wide and ⅛ inch thick which went around all the poles and were drawn taut and sealed with a machine. A bundle of some five, six or seven poles on the top of the load was also separately bound with two metal bands of the same sort, one at either end. The flat cars had metal sleeves or holders on both sides at floor level and four stakes of hard wood about ten feet long were stood up in holders on each side of the load. Two of the stakes were close to each end of the poles on each side of the cars. The bolsters across the car floors were set between the stakes. Most of the stakes were of untrimmed branches, larger than the holders, and were whittled down at one end to fit taut and stand upright in the holders. Other stakes appear to have been sawed four by fours. A nail was also driven in the lower end of each stake to hold it down in the sleeve. Heavy wires were strung from near the top of each of the four stakes on one side of the cars across the top of the load to each of the four stakes directly opposite on the other side of the cars.

Experienced inspectors for the creosote company and for the railroads inspected the cars and the load many times before and at the time of arrival at Gilmore City, and there is no question but that the shipment was at all times in good order.

Beginning the operation of unloading the poles, one member of the crew cut the wires leading from each of the four stakes on one side across the load to the opposite four stakes on the other side, so that the stakes were left standing with no support except as their lower whittled ends remained in the sleeves. Then another crew member, working from underneath the cars with an axe cut each of the three 2 by ⅛ inch metal bands that went around all the poles. He worked from underneath the cars while engaging in the band cutting and the rest of the crew stood off at a distance because it was understood that when the poles were released from the supporting bands it was reasonably to be expected that the poles would spread and roll down from the pile. It turned out they did not do so. The crew waited all of ten minutes expecting a spreading and rolling of the poles but none was observed.

After the ten minutes of waiting had elapsed the decedent Fries climbed up on top of the poles (apparently without any direction to do so) and using a bolt cutter which he carried in his hand, he cut the metal band which was around one end of the top bundle of poles. There was still no movement or spreading of the poles and he walked along the top of the pile to where the other metal band was bound around the other end of the bundle and he cut that last remaining band. When all the wires holding the stakes and all of the five metal bands holding the poles had thus been cut, spreading and rolling of the poles occurred immediately. The stakes at the sides of the cars then had nothing to support them but the ends that were within the sleeves and the heavy poles broke them off on one side of the cars. Part of the poles fell to the ground on that side of the cars. Fries struggled to ride the rolling poles but was unable to extricate himself. He was overturned and crushed to death. He was 36,

years of age and left two small dependent sons surviving him.

The amended complaint was in two counts, in the first of which the plaintiff alleged that "the defendants were negligent in the manner and method in which the poles were loaded in that the poles could not be safely unloaded" and that "plaintiff in this count relies upon general allegations of negligence and carelessness, under the rule and doctrine of res ipsa loquitur." In the second count the charge of general negligence in failing to deliver the flat cars in such condition that the same could be safely unloaded was repeated and particulars of negligence were charged in that insufficient stakes and bands were used and they were improperly placed so that the load of poles could not be safely unloaded. Also that defendants failed to make proper inspection of the load or "if the same was inspected, in failing to discover that said cars could not be safely unloaded."

In their respective motions for peremptory instructions at the close of all the testimony the defendants specified as grounds, among other things, (1) that the rule of res ipsa loquitur relied on by plaintiff had no application under the circumstances in evidence in that the accident to plaintiff's decedent resulted from a situation created by the unloading crew of which he was a member while that crew had complete and exclusive control of the instrumentality causing the damage. That it resulted solely by reason of that crew's voluntary action in cutting all of the supporting wires and bands that were holding the load. The last of them were cut while the decedent was on top of the load. As to that action neither of the defendants had any direction, control or responsibility. (2) That there was no evidence that the cars of poles were so improperly or negligently loaded that they could not be safely unloaded. Also (3) that the only inference that could fairly and reasonably be drawn from the evidence was that the negligence of the unloading crew, including that of plaintiff's decedent, was the direct and proximate cause of the accident. (4) Each defendant asserted further that there was no causal connection between any act or omission of either of them and the death of decedent.

█ 1. We find no error in the refusal of the trial court to submit the case to the jury as prayed by the plaintiff "under the rule and doctrine of res ipsa loquitur." The doctrine is recognized and applied in Iowa where this accident occurred in a proper case when it appears that a plaintiff has been injured through an instrumentality which is under the complete and exclusive control of the defendant and the injury is not shown to have been caused by the voluntary act of the plaintiff.

But in this case the poles involved were heavy and round and their propensity to roll when piled was apparent. Notwithstanding such propensity the load of poles was and it had been completely safe during a thousand miles of transportation. Each and all the means by which the poles were held safe were in plain view. Plaintiff's decedent and his fellow unloaders had complete information as to the condition of the load and had exclusive control of it for unloading purposes. The cutting of all wires and bands was the action that caused the poles to roll and crush Fries to death and that cutting was the voluntary action of the unloading crew. Regardless of whether or not that action was negligent, it was manifestly the causative action and it was taken by persons in complete control who were entirely independent of defendants. Such control and voluntary action causing the damage complained of entirely precludes application of the doctrine of res ipsa loquitur to the case. A thorough analysis of controlling Iowa decisions defining the Iowa rule as to res ipsa loquitur was made by Judge Graven in Highland Golf Club v. Sinclair Refining Co., D.C., 59 F.Supp. 911, q.v.

█ 2. There was no evidence as to any particulars in which the cars were so negligently or improperly loaded that they could not be safely unloaded. In making out her case in chief the plaintiff introduced the testimony of the members of the unloading crew who testified without substantial disagreement how the poles were loaded and secured on the cars and how they undertook

to unload them. Plaintiff had no witness experienced in loading such poles on such cars and none qualified to or assuming to testify that the cars were improperly or negligently loaded so as to be unsafe for unloading. But defendants produced the experienced and qualified employee of the Creosote company who had bossed the loading job and also persons who were familiar with loading and unloading such poles over a course of years and were qualified to testify as to how it should be done. There was nothing to rebut their evidence that the poles were safely loaded and could have been safely unloaded by the use of proper methods and tools. Neither was there anything to rebut the evidence of the railroad inspectors that the load was safe and in compliance with railroad requirements.

■ 3. Although it is well settled in Iowa, as elsewhere, that the question whether or not an injured plaintiff has been guilty of contributory negligence is ordinarily a jury question, there must be a real question to justify submission to the jury. In this case the evidence establishes that the action of the decedent in mounting upon the load of poles from which practically all support except the two bands on the top bundle had been cut and walking upon and standing upon the top of the precariously cohering load while he cut first one and then the last one of the retaining bands entailed great danger. Such danger was apparent. If a proper unloading method had been followed and proper tools used no such risk would have been involved in the unloading. Contributory negligence in the unloading was so plainly demonstrated that only one conclusion could be fairly drawn. It was attributable to the unloaders and not to either of the defendants who had nothing to do with the unloading. Whether the decedent himself was insufficiently informed by his employer of the danger or acted with understanding of the open and apparent danger of his action is irrelevant as to the defendants in this action. There was negligence contributing to the accident. It was not their negligence or in anywise attributable to them.

■ As the trial court stated when ruling on the motions for directed verdict, no Iowa case was found in which a plaintiff was injured unloading poles from flat cars or which involved the question of contributory negligence of such an unloader. But it cannot be questioned as to all such operations that a safe method must be adopted and proper direction and efficient tools supplied by anyone who contracts for and undertakes performance. A workman on the job must also use due care and may not recover for damages under Iowa law without showing himself to have been free from contributory negligence. Kinney v. Larsen, 239 Iowa 494, 31 N.W.2d 635; Lemke v. Chicago, R. I. & P. R. Co., 8 Cir., 195 F.2d 989. The following cases from other jurisdictions in which recovery was denied for injury or death suffered in the unloading of poles from cars are illustrative: Southern Ry. Co. v. Edwards, 5 Cir., 44 F.2d 526; Edwards v. Southern Ry. Co., 233 Ala. 65, 169 So. 715, 106 A.L.R. 1133; Anderson v. Southern Ry. Co., 4 Cir., 1927, 20 F.2d 71; Reed v. Missouri, K. & T. R. Co., en banc 1951, 362 Mo. 1, 239 S.W.2d 328. Insofar as the court's ruling and judgment was rested on the contributory negligence of plaintiff's decedent the court's appraisal of Iowa law and its ruling are not found to be erroneous.

■ 4. The Graybar company defendant was a buyer and seller of the poles in question required under its contracts to pay the Creosote company for them delivered on board cars to the co-operative at Gilmore City and entitled to receive the price therefor from the co-operative upon its acceptance of the shipment. The accident happened after the poles had been so accepted and after the purchaser had turned them over to the crew of the independent contractor for unloading. The co-operative had requested that the poles be loaded on flat cars and Graybar forwarded that request to the Creosote company which complied, but it is not shown that Graybar had agreed to or was expected to or had occasion to or ever did direct or see the loading or the load. The Creosote company was an independent contractor and the plaintiff-appellant has not pointed out any act of commission or omission on the part of Graybar that could be found to be a tort causing the

death loss in this case for which Graybar could be held liable in the action. No actionable negligence or submissible case was made out against the Graybar company. Likewise as to the railroad company. It neither loaded nor unloaded the poles. It caused the cars and the shipment to be inspected by experienced inspectors who found them in compliance with railroad requirements and in good order. The railroad transported them safely. No defect in the load has been pointed out by the plaintiff which existed or should have been discovered by the railroad. Nor was there any act of commission or omission on the part of the railroad contributing to the damage.

As we find in the record no evidence to support a verdict or judgment for the plaintiff against either defendant, the judgment of dismissal is in all respects affirmed.