Naomi RUSSELL, Appellant,

v.

**HOUSTON BELT AND TERMINAL RAILWAY COMPANY et al., Appellees.**

No. 6572.

Court of Civil Appeals of Texas. Beaumont.

Nov. 1, 1962.

Rehearing Denied Nov. 28, 1962.

Tonahill & Addington, Jasper, W. P. Bondies, Dallas, for appellant.

Orgain, Bell & Tucker, Beaumont, for appellee Kansas City Southern Ry. Co.

Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellee Houston Belt & Terminal Ry. Co.

Marcus & Weller, Beaumont, for appellee Texas Creosoting Co.

Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellee Texas & N. O. R. Co.

McNEILL, Justice.

This is a suit for damages brought by appellant, Naomi Russell, on account of the alleged wrongful death of her husband, M.

D. Russell. She sued appellees Houston Belt and Terminal Railway Company, Kansas City Southern Railway Company, T. & N. O. Railroad Company and Texas Creosoting Company. It was alleged that Russell, while an employee of the Coastal Construction Company, was killed July 2, 1956, when a load of creosoted poles he was helping to unload from two flat cars fell upon him. Superior Insurance Company, having paid Workmen's Compensation insurance to plaintiff on account of this accident, intervened to recover the amount paid. Since the parties occupy the same position here as in the trial court, they will be designated herein as they were in that court.

It was shown that defendant Texas Creosoting Company, herein, sometimes called creosoting company, had loaded these poles or piling in its plant at Houston, Texas, upon two flat cars, and that through the transportation by the three railway companies the load was brought to Port Arthur, Texas and delivered a month or so later to the Coastal Construction Company, consignee. The load was run onto the railroad spur track in the construction company's plant for unloading. The construction company was in the business of building docks and driving piling in coastal waters. The load of piling was left on the spur at a place so that it sat immediately west of the water channel in which the construction company had a barge, upon which was a rig with an 80 or 90 foot boom like a dragline.

Plaintiff alleged that the deceased came to his death because of the negligence of the defendant creosoting company in failing to properly inspect the load of poles, in shipping the load which had shifted in transit producing a dangerous condition, in using an inadequate number of stakes to hold the load, in shipping the poles which were too heavy for the stakes and bands used to hold said poles, in providing an inadequate number of stakes, in failing to load the poles in compliance with the rules of the Association of American Railroads applying thereto, and in failing to alternate the butts of the poles so that part of them would be at each end of the load.

Though the railroad companies were made parties defendant by plaintiff and alleged that they were each negligent in failing to properly inspect the load of poles when delivery was made to each of them, plaintiff's brief urges no point against the railroads.

After plaintiff had rested her primary case, the several defendants made motions for instructed verdict which were granted and judgment was entered that plaintiff take nothing.

■ Plaintiff urges 7 points of error. The creosoting company asserts that plaintiff's first, second, third and fourth points are too general and are mere abstract statements of law and should not be considered. While these points are probably subject to this objection, we have, nevertheless, considered them upon the basis of the statements and arguments made thereunder. Plaintiff asserts that she raised issues of negligence upon the part of creosoting company that should have been submitted to the jury in the following respects: (1) In using an inadequate number of stakes to hold the load; (2) in the method of loading the piling; (3) the load was not interlaced and was without sufficient number of bands; (4) in loading the poles without stake ties, and (5) without supplemental metal bindings.

■ In the first place, the creosoting company owed no duty to warn the employees of the Coastal Construction Company of any transitory dangers arising during the unloading of the piling. The load of piling arrived at destination in good condition. The dangerous condition which took Russell's life was one having to do solely with the manner of unloading the piling. Undisputably this work could have been safely done. The following quotation from Moore v. Texas Company, Tex.

Civ.App., 299 S.W.2d 401 (p. 403) is, therefore, applicable:

"The danger to which appellant became subjected was a danger which came into being, not from the condition of the premises or the place of work, but from the manner of performance of the job to be done by those who were working together."

See, also, Sword, Houston Fire & Cas. Ins. Co., v. Gulf Oil Corp. (5th Cir.), 251 F.2d 829. It was held in U. S. Steel Corp. v. McCraney (5th Cir.), 257 F.2d 457, that the duty upon the shipper of goods "was to load the car so that, when it reached destination, there would be no hidden defects in the loading, and that the consignee could, by the exercise of proper care, safely remove the lading. It owed no duty to the unloaders to see that in unloading proper safety measures were taken; this duty rested on the consignee and its employees." However, should we be mistaken on this point, we have nevertheless carefully examined the evidence, and have reached the conclusion that it does not raise an issue of fact upon any of the five grounds contended for by plaintiff. A summary of the evidence bearing upon these issues will be reflected in the succeeding parts of this opinion.

The testimony reveals that a printed pamphlet is published by the Association of American Railroads setting forth rules as to the loading of piling and this pamphlet is in evidence. It was shown that the piling loaded was unusually large piling from 20 to 24 inches in diameter at the butt, about 6 inches at the top, and 75 feet in length. On account of the length it was necessary in shipping them to place these poles upon two connecting flat cars. The rules just stated require that the butts be alternated between the two cars so as to divide the weight evenly. The proof showed that this was done. There was some reference in the testimony to what was called interlacing the logs. By this it is not clear just what is meant unless in alternating the butts the top end of one layer of logs would lay in the cracks between the butts at the other end of the load. During examination of a witness, questions were asked about some drawings made on the blackboard with reference to the meaning of this type of loading, but these drawings were not brought up and are not available for our consideration. One witness said that the pilings were four feet high, one on top of each other, at the stakes. We are not able to tell whether this violates the interlacing requirement.

In addition to alternating the ends, the rules require two pair of stakes to be placed at the outer end of each flat car and these are held together with wires or small bands running across the load at the top. No stakes are used during the shipping process inside these outer stakes in a twin load as this one was, evidently because of the need for flexibility in the movement of the cars. When such a load is half loaded two 2 inch heavy gauge steel bands are placed around this piling about 16 feet from either end. These are referred to as center bands. When the load is completed some 6 or 8 bands are put at intervals around the entire load of piling and the wires or bands are fastened to the stakes at the top in order to steady the load on the cars.

The evidence clearly shows that this was the procedure followed in the load involved. There were 28 piling, 75 feet long on this load, and because of the size of the piling, the load was some 6½ feet high from the top of the flat cars. Witnesses testified that the only thing unusual about this load when it reached its destination in the yard of the Coastal Construction Company was that it was a big load.

The testimony further shows that the load arrived in good shape at destination. The witness Schahn testified he did not believe the load was angled to one side or the other. He later said he could not recall whether the load was sloping or not.

Earl Phares stated that the load appeared to be listing slightly to the west. He said this was noticeable but not dangerous. The testimony fails to show whether this slight listing was because of a shift in the load, or because the beds of the flat cars were not quite level. The witness Al Brown stated that when he was on top of the load at destination and examined it he found that the bands were all tight and that the stakes were all strutted. This indicates pressure of weight existed against both sides of the load.

We fail to find any evidence in the record indicating any standard of care in loading the piling except as reflected in the pamphlet of rules introduced by plaintiff. This we think is one distinguishing feature between Hanson v. Ponder, Tex. Com.App., 300 S.W. 35, upon which plaintiff relies, and the present case. Furthermore, the loader of the piling was not sued in Hanson's case. See, Tex.Civ.App., 293 S.W. 219. However, plaintiff asserts that creosoting company was negligent in furnishing an insufficient number of bands and stakes to hold the load. Suppose more bands were put around the load. They still would have to be cut before starting the unloading process. It was not shown at which band cutting the load would give way. It could as well have been the 3rd or 4th as the 1st. The process of unloading, so far as this record shows, required all the bands to be severed. The contention that insufficient number of stakes were furnished does not have weight. Because of the movements of the joined flat cars in travel, only two pairs of stakes could properly be used at the further end of each car. Each pair of stakes were wired across the load. The load arrived in good tight condition. It was not shown whether the wires holding the stakes on this load were cut before the band or bands were cut by Russell. Under the facts no negligence was shown. Stokes v. Burlington-Rock Island R. Co., Tex.Civ.App., 165 S.W.2d 229 (231). Testimony did show that a method of safety could have been the insertion at destination of a number of stakes along the flat car brackets. It is not contended, however, that the shipper should have sent such additional stakes along for this purpose.

The creosoting company urges that deceased was contributorily negligent as a matter of law, and that deceased voluntarily encountered the risk of cutting the band knowingly, or fully charged with knowing, the danger involved. It was shown that usually five men were assigned to unload a load of piling. They occasionally did this but it was not their principal work as pile drivers. The crew began work preparatory to unloading this piling on Monday morning, July 2nd, at 7:30. Lloyd Schahn and the deceased were detailed by their foreman or yard superintendent, Joe Brown, to prepare a location by the spur track to place the piling as they were unloaded. This was done by placing a series of old piling along the ground west of the track so as to keep the new piling from warping or bending in the pile until used. Foreman Joe Brown sent Al Brown up on top of the load of piling to cut the bands. After Schahn and Russell had completed the place for the piling they went to the load and climbed up at the north end of it where they met Al Brown coming along the top from the south end. He had bumped or tested each of these bands with an ax and told Schahn and Russell that the bands were tight, and that he was not going to cut them. On this Schahn testified:

"Q. As a matter of fact, didn't Mr. A. M. Brown tell you in the presence of Russell while he had possession of this axe, that these bands look tight, and they look dangerous to me?

"A. Yes, sir.

"Q. Is that correct? A. Yes, sir.

"Q. And didn't he further say that I am not going to cut these bands without the line? A. No, sir, he didn't say nothing about the line to my mem-

ory. He said, 'I am not going to cut these bands.' I believe he said, if I am not making a mistake, that they look too taut, or something of that nature.

"Q. You mean the bands looked too tight? A. Yes, sir, too tight.

"Q. All right. Now, when Mr. Brown told you that, you already knew that it was dangerous to cut bands while you were standing on top of a load? A. Yes, sir."

And again:

"Q. You already knew it was dangerous didn't you? A. I realized it was dangerous to cut the band on any load.

"Q. Mr. Brown called your attention to whatever condition caused him to be apprehensive? He told you, didn't he? A. Yes, sir. He did.

"Q. Before anybody took any action? A. Yes, sir.

"Q. And Mr. Russell was there and he heard this conversation, didn't he? A. Yes, sir, he did.

"Q. And as I understand, immediately after that, Mr. Russell said, 'Give me that axe. I am not afraid. I will cut those bands.' Is that what he said? A. Yes, that's what he said.

"Q. And you realized at that time that if he cut those bands, you are going to have to scramble, or do something?

"Mr. Addington: Your Honor, again I object as to what was in the mind of the witness. It is something I can't possibly examine him on. He didn't convey it to anyone.

"Court: Objection overruled.

"A. Yes, sir, I realized that what did happen was going to happen. I realized it was going to go."

Plaintiff's witness, Al Brown, in describing this situation, testified:

* * * "A. Well, when Lloyd and Mr. Russell came up on the car, I told them that I wasn't going to cut those bands, that they were too tight.

"Q. Other than that, did you say anything before Mr. Russell took the axe, or you handed it to him? A. I don't remember.

"Q. How long a period of time elapsed from the time you said that until Mr. Russell cut the bands? A. Just a short time. I don't remember. I couldn't tell you exactly, but just a short time, though.

"Q. Was it a matter of seconds or a few minutes? A. Seconds.

"Q. And do you remember what Mr. Russell said to you when he took the axe or when you handed it to him? A. Well, he said, 'Let me have the axe.' That he wasn't afraid to cut the band."

* * * * * *
"Q. What was your purpose in telling these other men that these bands, that you had inspected it, that you found the bands were tight, and you weren't going to cut it without a line? A. That was my opinion of the load."

* * * * * *
"Q. Then as I understand it, the sequence was that after you told them this, Red Russell said, 'Give me that axe. I am not afraid. I will cut that band, or 'I will cut those bands.'

"A. Yes.

"Q. Did he take the axe from you then? A. I believe I handed it to him.

"Q. And the minute you handed the axe to him, what did you start to do? Or did you say anything else to him?

A. I told him, 'Give me time to get down on the ground, off of the car.'

"Q. You told him, 'Give me time to get down on the ground off of the car,' didn't you? A. Yes, sir.

"Q. Didn't you do that because you knew it was unsafe in your own mind? A. It was unsafe to me."

Schahn stated that these pilings were long and heavy and consequently dangerous to unload. On this he said:

"Q. Of course, this danger was apparent to an experienced pile driver as you were? A. Yes, sir.

"Q. Not only was it obvious as you stood there, but Mr. Brown specifically called the apparent danger to your attention and to Mr. Russell's attention? A. Yes, sir, he sure did."

And as to the experience which he had had in this work and the experience Russell had had, he testified:

"Q. How long prior to this had you been working with piling? About eight or nine years? A. Yes, sir.

"Q. And you knew, based on your long experience, that when you got up on a load of piling without any means of escape and started cutting those bands, that it was dangerous, didn't you? A. Yes, sir, sure was.

"Q. And Russell had a lot more experience than you had, didn't he? A. Yes, sir, I would say he did.

"Q. Any man engaged in your occupation and doing that type of work in the exercise of any kind of care at all would know that it is dangerous to get up on a load of piling and to start cutting bands, wouldn't he? A. Yes, sir.

"Q. You know when you do that, you take a chance on your own safety, don't you? A. Yes, sir."

It was shown that there were several safety measures one could take in cutting these metal bands. The rig used by the construction company had a boom that swung a line and this line on the occasion involved was hanging over the load, and the witness Schahn had hold of it. When Russell cut the band, (apparently about the second one from the north end) the top half of the load fell off the cars to the west side, killing him. Schahn held on to the line above, and as he described it, "rode" the piling as they fell under his feet and escaped injury, while Al Brown had to jump under the flat cars as he realized the load was falling. In order to have cut the band safely with an ax, the workman could have ridden the line or made a swing out of it so that he would not stand on the load, or he could have cut the band from beneath the load, under the flat cars. Or the line swinging from the rig boom could have been fastened to one of the poles and standing on that one could have cut the band and would have been relatively safe. Additional stakes could have been put in the "squares" along the side of the flat cars to hold the load when bands were cut and the poles were being lifted off onto the ground. The condition of the load which would give rise to danger to any person undertaking to unload it was, open and visible. It was not shown that deceased used any care whatsoever for his own safety. He was experienced in the work and must have known of the dangerous propensity of the load to run, upon the severance of a band or bands. Southern Railway Co. v. Edwards, 5th Cir., 44 F.2d 526. But with reckless disregard for himself and his fellow-workers, without giving Brown an opportunity to get off the load, as Brown requested, proceeded to cut one or more bands, precipitating the avalanche of pilings. He must be held to have assumed the danger of such act. From McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391, we quote (p. 394):

"In determining liability, under the defense of voluntary exposure to risk, it is said that one cannot recover for

injuries sustained while voluntarily exposing himself to a danger which he either does or should fully realize and appreciate."

Since deceased could not have recovered for his injuries had he lived, his widow cannot do so for his death.

The judgment is affirmed.