**E. I. DU PONT DE NEMOURS AND COMPANY, Appellant,**

v.

**James T. KISSINGER, Appellee.**

**No. 16895.**

United States Court of Appeals
Fifth Circuit.

Sept. 22, 1958.

Rehearing Denied Nov. 7, 1958.

Frank M. Dixon, Thomas F. McDowell, Birmingham, Ala., Bowers, Dixon, Dunn & McDowell, Birmingham, Ala., of counsel, for appellant E. I. duPont de Nemours & Co.

Robert S. Vance, R. Foster Etheredge, Birmingham, Ala., Hogan & Callaway, Birmingham, Ala., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

Prior to February, 1942, appellant duPont constructed a warehouse building and turned it over to its owner, the United States of America. June 17, 1955, appellee Kissinger, an employee of Associated Contractors, engaged in rehabilitating the buildings of which the warehouse was one, received personal injuries when the handle came off of one of its doors he was attempting to open, causing him to fall several feet. The court below submitted to the jury the civil action brought by him, resulting in a verdict for $20,000.00 upon which judgment was entered in favor of Kissinger and the insurance company which had been paying him under the Alabama Workmen's Compensation Law, Code 1940, Tit. 26, § 253 et seq.[1] duPont appeals, claiming that its requests for directed verdict should have been granted on the grounds that no negligence on its part was shown by the testimony and that it was absolved from liability under the facts of this case by reason of the completion of its work as contractor and acceptance of the building by the owner more than thirteen years before the accident.

In 1941, duPont was employed to construct this warehouse, known as No. 229–17, as part of the Alabama Ordnance Works at Childersburg, Alabama. The plant was "a temporary or five-year plant * * * [and was not] to consist of a permanent type of construction unless specifically authorized in advance by the Secretary of War."[2] Upon its completion early in 1942, duPont was engaged to, and did, operate it until late in 1945, at which time it was turned over to the United States and thereafter duPont had nothing to do with the plant and no re-

---

1. United States Fidelity & Guaranty Comany was permitted to intervene to recover $4,376.21 it had paid Kissinger as the Workmen's Compensation insurer of Associated Contractors, his employer. Kissinger will be referred to throughout as appellee.

2. There was no such authorization in connection with this warehouse, but appellee contends that the building was in fact of a permanent type because it had a concrete floor and metal siding and roof. These facts would not tend to dispute the temporary character of the building without some showing of the richness of the cement mixture, its foundation, the character of framework to which the metal was attached, the gauge of the metal, etc.

sponsibility for its upkeep. A caretaker crew was placed in it by the Government.

Nine years later, the United States decided to rehabilitate the buildings, and Rust Engineering Company was employed as architect-engineer with Liberty Powder Defense Corporation as consulting engineer.[3] March 8, 1955, the Government agreed with a group of contractors known as Associated Contractors for the "rehabilitation" of the Alabama Ordnance Works, under the supervision of Rust and Liberty. The warehouse involved here was included in the list of buildings to be rehabilitated. Originally all wooden doors were to be replaced with aluminum doors, but this was subsequently changed so that the wooden doors were to be repaired and covered with aluminum with asbestos lining. The door hardware was to be repaired and put in satisfactory condition or replaced, as might be determined as the work progressed.

The contractors obtained permission to move some heavy machinery from another building to Warehouse 229–17, and appellee Kissinger was one of the crew engaged in this removal. The truck upon which a load of machinery was being transported was backed to one of the doors to this warehouse building, the rear end of the truck matching the height of the door, which was about four feet from the ground. Kissinger grasped the handle to open one of the sliding doors, and the handle pulled off, causing him to fall backward off of the truck onto the ground and to receive severe injuries.

The door was one of a pair of wooden doors, each weighing about two hundred fifty pounds and sliding laterally upon rollerbearing wheels attached to the top of each door. Apparently the door did not move at all, and it is not shown whether it had swelled, or was stuck, or why extra pressure was necessary to move it. The evidence was in dispute as to whether it was latched on the inside.

The gravamen of appellee's complaint was that the handle was attached to the wooden door by four screws, each $\frac{3}{4}''$ long, and that the use of such short screws constituted negligence on the part of appellant. duPont defended on the grounds: that it was not sufficiently shown that the handle was affixed by screws $\frac{3}{4}''$ long; that there was no sufficient proof that the use of such screws would be negligent; that there was no proof that the screws in the handle at the time of appellee's injury were placed therein by appellant; and that appellant, an independent contractor, had turned the building over to its owner and the owner had accepted it in 1942, and under the law it was not liable to appellee. The court below ruled against all of these contentions, and they are urged before us as grounds for reversal based upon the refusal of the court below to direct the jury to find for the appellant.

 Appellee offered in evidence and has brought before us a number of screws measuring from $\frac{3}{4}''$ to $1\frac{1}{4}''$ in length, along with the door handle. He claims that he established by the proof that this handle and the $\frac{3}{4}''$ screws were picked up from the ground at the time of his injury, and that these were the screws by which the handle was attached to the door. This proof is confused and not of a satisfactory nature,[4] and Liber-

---

3. The action was brought against Liberty along with duPont, and the jury returned a verdict against both and judgment was entered accordingly. The judgment against Liberty was later set aside and Kissinger appealed from that ruling, but has presented no argument before us in support of the appeal.

4. A member of the crew with appellee at the time of his injury testified that he picked up the handle with the screws still in it and threw it under the seat of the truck; appellee testified that, later, he got the handle and screws from under the seat of the truck and took them to the union hall; there is no sufficient proof of what was done with these articles in the union hall, but eventually they reached the office of appellee's attorney. The witness who picked them up identified the screws offered in evidence and measuring $\frac{3}{4}''$ in length as the same length of those in the handle when he picked it up.

ty's safety man testified that the handle and the screws were still on the ground at the point of accident some hours after it happened. On the whole, we think that the proof, though not strong, was sufficient to go to the jury on this point.

The proof was even weaker by which appellee sought to establish that the screws were the ones which duPont had placed in the handle some thirteen years before the accident; and that, under the circumstances and conditions existing at the time of the installation, the use of ¾" screws constituted negligence. There was no direct proof at all that the screws were those initially installed, and appellee is content to argue that their presence in the handle at the time of the accident raises a sufficient presumption that they were the ones installed by appellant.

To establish that the screws were too short, appellee introduced Mr. Moore, who was, in March, 1957, in charge of the building hardware department of a hardware store in Birmingham. He called himself a hardware consultant, but admitted that he was not an expert on screws. He had been in this line of business about fourteen years. In answer to a hypothetical question as to "what size screws would be proper" to install the bow-type handle on a door of the weight and dimensions established by the testimony, he stated that, in his opinion, a screw 1½" long should have been used. Shown the screws appellee had placed in evidence, he testified that they would be "an improper size." His testimony was introduced over appellant's objections.[5]

The proof did not show the type of wood of which the doors were constructed. The court declined to permit appellant's counsel to include in his hypothetical questions the fact that the building was constructed with only a five-year life expectancy.

Appellee also used Mr. Pennington, an official of the carpenter's union who worked also as a carpenter, who gave testimony along the same line as the witness Moore. He finally stated, in response to a question by the court: "If I were the architect, if you will pardon me, your Honor, I would install a handle of that size with a ⅜₆th stud bolt."

The burden appellee was attempting to sustain by the use of these two witnesses was that the use of a ¾" screw in the handle was not in keeping with what the average prudent man would have done if engaged in construction work under like circumstances in the same area and at the same time this building was constructed. No effort was made to show that either witness knew anything about practices in 1941-2 or at Childersburg, Alabama. The proof was of little value, therefore, in establishing this crucial element of appellee's case. Viewed from one angle, possibly these witnesses proved too much. From the gist of their testimony it would be inferred that a ¾" screw would not be sufficient to hold the handle on the door for any length of time or under any circumstances. Since it was undisputed that the handle had been on the door more than thirteen years during part of which time it had had steady use, this proof would give support to the assumption that probably these particular screws had not been placed in the handle by duPont. It is also noteworthy that if a screw meeting witness Moore's requirements had been used, negligence of appellant would still be inferable under witness Pennington's opinion that the use of a bolt was indicated.

Appellee testified that, when he looked at the door preparatory to opening it, it "looked to me as solid as these walls look here." He also placed on the stand

5. On cross examination Moore struck by his answer that the ¾" screws would be improper when he was asked this question by appellant's attorney: "Let's assume that that door was used almost daily, and several times a day during World War II, and that it was used during the interval between World War II and the Korean War, and used during the Korean War, and that it was pushed and pulled and yanked on, including up until the day before June 17, 1955, and there was nothing ever noticed wrong with that handle, would you say that it was put on there properly?"

one of his associates who was on the truck with him, who testified that the wood where the screws entered it appeared to be in good shape. There was no proof on the part of appellee that anyone probed into the wood, or made such an examination to ascertain whether the wood at the point was firm or pithy under the surface or how much it had deteriorated during its thirteen years of exposure to the weather.

It was undisputed that the entire installation of some sixty-nine buildings was made initially with an expectancy of five years' use. The watchword during the progress of such war projects was speed rather than quality. It would take proof of a convincing character to overcome the assumption which would be universally indulged that a door forming part of such an installation would inevitably have lost much of its vitality and solidity during thirteen years of exposure to the elements.

Pictures were placed in evidence showing warning signs at places in the vast plant cautioning all persons to be on the lookout for rotten floors and steps. Plaintiff, himself, who had worked in the construction of the plant in 1941, admitted that he and the other employees of Associated Contractors had attended safety lectures adjuring the employees to be careful because the buildings were old, and that they had been warned by the safety director to watch out for the deteriorated condition of the wood in some areas.

The evidence showed that duPont had employed approximately 3,800 carpenters on this project about the time this warehouse was constructed, and that it had no records from which it could determine who installed this handle or the type and size of the screws which were used.

In discussing the sufficiency of the evidence to make a case for the jury, both parties devote the major portions of their briefs to a discussion of the general rule that a contractor is not liable to third parties for negligence in the construction of a building after it has been turned over to and accepted by the owner. Appellee concedes this to be the rule, but claims that the facts of this case bring it within the exception, which he defines thus: "Where it is reasonably certain that if a thing is negligently manufactured * * * that life and limb will be placed in danger, a duty of care exists even in the absence of privity and liability results in the case of persons injured by reason of such negligent construction * * *" Appellee seems to base his case largely on the branch of the exception which holds the contractor liable "if the thing constructed is inherently or imminently dangerous * * *" Each party cites and analyzes a large number of cases and most of them are taken from an exhaustive annotation on the subject beginning at page 191 of 13 A.L.R.2d.[6] This note devotes substantially forty pages to a discussion of the rule and of the cases where it has been followed; and substantially twenty pages to the exceptions to the rule and cases where the rule has given way to the exception. This annotation develops the whole theme in a way which we could not possibly do within the limitations of this opinion.

We are called upon here to determine what the law is in Alabama, where it appears no decision has been rendered applying the exception to a building contractor. Our attention is called to three cases all involving alleged negligent *manufacture*, which we will discuss in the order of their dates.

In Sterchi Brothers Stores, Inc., v. Castleberry, 1938, 28 Ala.App. 281, 182 So. 471, 472, the Court of Appeals of Alabama reversed a judgment against a storekeeper who sold an electric refrigerator which "exploded" by reason of the escape of gas from a small pipe which cracked, the court feeling that, as far as the merchant was concerned, the article was not imminently or inherently dangerous. The Supreme Court of Alabama reversed,[7] calling attention to the

---

6. And see also annotations in 41 A.L.R. at page 8, and 123 A.L.R. at page 1197.

7. Same case, 236 Ala. 349, 182 So. 474.

fact that Sterchi had made the installation with knowledge of the defect and had attempted to "adjust, repair or restore said refrigerator to a proper working condition," in connection with which there was negligence. Leaning heavily upon the decision of Judge Sanborn in Huset v. J. I. Case Threshing Machine Co., 8 Cir., 120 F. 865, 872, the Supreme Court of Alabama declared that when a merchant delivers a machine "imminently dangerous to the lives and limbs of all who should undertake to operate it," with knowledge that there is danger and with the agreement to keep the instrumentality in repair, he is liable if, in breach of his undertaking, damage results to the purchaser.

The Alabama Court had before it another suit against a manufacturer in Altorfer Bros. Co. v. Green, 1938, 236 Ala. 427, 183 So. 415. Mrs. Green was injured when her hand was caught in the wringer of a washing machine which she charged Altorfer knew was dangerous but failed to give her any instructions as to such danger. The court quoted from Judge Cardozo's opinion in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1052, L.R.A.1916F, 696, these words: "It is possible to use almost anything in a way that will make it dangerous if defective. That is not enough to charge the manufacturer with a duty independent of his contract. * * * If danger was to be expected as reasonably certain, there was a duty

of vigilance, and this whether you call the danger inherent or imminent." The case adverts to the exception to the general rule existing where a device is inherently or imminently dangerous.

Miles v. Chrysler Corp., 1939, 238 Ala. 359, 191 So. 245, 247, presented to the Alabama Supreme Court a case where Mrs. Miles was injured because the right front door of an automobile manufactured by Chrysler came open as the result of a defect in manufacture which permitted the door to open without operation of the handle. The trial court granted judgment of nonsuit against Mrs. Miles and the Supreme Court reversed. Citing the Huset and MacPherson cases, it stated: "Under the facts as presented by Counts C & D, at common law, where there was no privity of contract, there was no liability. In the course of human events, however, this was found to be unjust and exceptions were made in the rule laid down by the common law under the doctrine of 'manufacturers' liability' in what may be now called the pioneer cases."[8] On the basis of the Huset and MacPherson cases along with the two Alabama cases above discussed, the court reversed because the trial court had held the counts setting forth the facts above outlined to be insufficient.

These three cases have no tendency to sustain appellee's position here and do not indicate that the rule thus developed respecting manufacturers of

8. The Supreme Court of Alabama, 191 So. 247, further quoted from the MacPherson case language by Judge Cardozo as follows: "We hold, then, that the principle of Thomas v. Winchester [6 N.Y. 397] * * * is not limited to poisons, explosives, and things of like nature, to things which in their normal operation are implements of destruction. If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufac-

turer of this thing of danger is under a duty to make it carefully. That is as far as we are required to go for the decision of this case. There must be knowledge of a danger, not merely possible, but probable * * * But it is possible that even knowledge of the danger and the use will not always be enough. The proximity or remoteness of the relation is a factor to be considered. * * * Precedents drawn from the days of travel by stagecoach do not fit the conditions of travel to-day. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be." [Emphasis added.]

dangerous mechanisms should be extended to building contractors.[9]

We are cited to no other Alabama cases which indicate that the exception to the general rule would be applied to a contractor just as it is to a manufacturer, or at all. Reason and common sense would point out a vast difference between an electric washing machine, with all of its intricate moving parts, and an ordinary bow-type handle applied to a wooden door with screws. The reason for the rapidly changing rule in the case of complex manufactured articles is well pointed out by Judge Cardozo in MacPherson. Those reasons would not apply at all to such a simple contrivance as a screw in a wooden door.

And this difference is recognized by the cases generally, and is thus expressed by the author of the note above referred to: [10] "The legal principles governing the liability of building or construction contractors for injuries or damages to third persons occurring after the completion and acceptance by the owner of the contractor's work, as a result of the contractor's negligence in the construction of the work, have frequently been identified with the principles governing the liability of the manufacturers or processors of articles for injuries or damages to third persons not in contractual privity with the manufacturer or processor. While there is a sufficient similarity, in respect of liability to such third persons, between the situation of a manufacturer of articles and a building construction contractor, to warrant the application to the latter of legal principles governing the liability of the former, there are also material factors or considerations applicable to one which are not applicable to the other, which in a particular instance may require the application of nonliability to a builder or construction contractor, although under similar circumstances a rule of liability might have been applied to a manufacturer or processor. * * * There is, therefore, found in the relation of the contractor and the contractee elements lacking in the relation of a manufuacturer and intermediate dealer which would warrant the application of the doctrine of proximate cause in such a way as to connect the injury more closely to the negligence of the contractee in exposing third persons to the danger of faulty specifications and separate it from the contractor's original negligence in constructing the dangerous structure."

There are cases [11] whose holdings tend to support the position taken by appellee here, but no case has been cited where the exception has been applied under facts approaching those here presented. The language last quoted is expressive of the general law as we find it in the cases referred to in the annotation and those cited to us by the parties. It rests to some extent on the right of the con-

9. We recently—in International Derrick & Equipment Co. v. Croix, 5 Cir., 1957, 241 F.2d 216–had occasion to consider Texas law governing the liability of a manufacturer to a person to whom its product had not been sold directly for injuries resulting from negligent manufacture. The case involved the collapsing of a leg of an oil derrick more than 130 feet from the ground occasioned by a defective weld which had been covered and made invisible by galvanizing. In examining the law of Texas we quoted a portion of the Restatement of the Law of Torts which had been quoted in a Texas case. We also adverted to an estimate made by a Massachusetts court of the MacPherson rule, supra. The Massachusetts court thought that, under MacPherson, the exception, where accepted, had swallowed the rule so as to obliterate it. We held that, under the facts of that case, the mere lapse of time (seven years) did not *per se* relieve the derrick manufacturer which had overcoated the defective weld with a galvanizer. It is obvious that that case is of little help to us in deciding this one.

10. 13 A.L.R.2d at page 196. And see at pages 196–233 of said annotation listing and analyzing cases from more than 31 states recognizing this difference and applying the general rule.

11. E. g., Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517; Hanna v. Fletcher, 1955, 97 U.S.App.D.C. 310, 231 F.2d 469; Hale v. DePaoli, 33 Cal.2d 228, 201 P.2d 1, 13 A.L.R.2d 183.

tractor to rely upon the specifications of the owner for whom he erects the structure—a right which would have special significance in this case in view of the known rigor with which the Government enforces its architectural and engineering requirements—as well as upon the fact that the owner of the structure is substituted as the one bearing the liability for its negligent maintenance.

The cautious application by the Alabama courts of the rule even as applied to manufacturers and their reliance upon such cases as Huset,[12] indicate a conservative approach to the general question; and there is no reason advanced before us to assume that Alabama[13] would not fall in line with the general rule supra, particularly as applied to the facts of this case, pointing very feebly as they do to any showing at all of negligence on appellant's part.

We had occasion recently to apply Florida law to an action brought against the manufacturer of an automobile where it was claimed that a man lost his life because of the negligent manuufacture of an automatic gearshift mechanism whose malfunctioning was alleged to be the proximate cause[14] of the accident. We upheld a directed verdict in favor of the manufacturer because the evidence was not sufficient to warrant submission of the case to the jury. Our language there is helpful in disposing of this case:

> "Without undertaking to match appellant's theories with theories of our own, for the simple reason that the question at issue, whether a jury case was made out, must be determined not by theorizing upon what might possibly have happened, but, by pointing, as it was appellant's duty to do, to evidence which, under settled principles, was sufficient on each essential issue to take her case

to the jury, we think it sufficient to say that primarily and necessarily fatal to appellant's case is the fact that, while there was some evidence that at some time after submersion and withdrawal of the car from the river, the outside jacket tubing of the steering column was found in the condition demanded by plaintiff's theory, there was no evidence whatever as distinguished from theorizing, showing or tending to show that this was the condition of the car at any time before its submersion, none showing that the looseness claimed to exist was due to negligence of the defendant in designing or manufacturing the car. Indeed, all the evidence offered by plaintiff, as to the condition of the car and its entirely satisfactory performance before it went into the river, established the exact contrary to have been its condition and that plaintiff signally failed to carry the heavy burden imposed on her by law to offer evidence tending to show, not that the car might have been, but that it was, before it went into the river, in the same defective condition plaintiff claims it is now in.

> "In this state of the evidence, absent the proof which plaintiff was required to produce as a prime requisite to her contention that no change had occurred, the jury would have been put in the fantastic position of having to speculate or guess whether the condition, testified to as existing after the submersion, had manifested itself before the car went into the river and whether, if it had, the deceased had been aware of it. It is settled law that verdicts may not rest upon such mere guess or conjecture.

\* \* \* \* \* \*

12. 8 Cir., 1903, 120 F. 865. And cf. also the attitude of the Alabama Supreme Court revealed in Jefferson Standard Life Ins. Co. v. Watson, 1942, 242 Ala. 181, 5 So.2d 639, and Crane Co. v. Davies, 1942, 242 Ala. 570, 8 So.2d 196.

13. Rayonier, Inc., v. Bryan, 5 Cir., 1957, 249 F.2d 405.

14. McNamara v. American Motors Corp., 5 Cir., 1957, 247 F.2d 445, 450-451.

"\* \* \* We do not think the evidence is sufficient to take the case to the jury on any theory. \* \* \*

"Finally, re-emphasizing that we are not here undertaking to declare that the evidence furnishes a sound basis for any particular theory, and that we are merely pointing out some of the flaws in plaintiff's own theory to make more clear the correctness of our view, we reaffirm that the evidence does not furnish a sufficient basis for taking this case to the jury, and that a verdict for defendant was demanded."

We are of the same conviction here, and we hold that, under the facts of this case, appellee was not entitled to recover and the jury should have been directed to find a verdict for the appellant. The judgment of the court below is, therefore, reversed and judgment entered here in favor of appellant.

Reversed.

HUTCHESON, Chief Judge (concurring specially).

Agreeing with the reasoning of and the result announced in the opinion, I concur fully in it. In order, however, to pinpoint more precisely my reasons for disagreement with the appellee's opposed view, I desire to state categorically that I agree with appellee that "Where it is reasonably certain that if a thing is negligently manufactured [or constructed] \* \* \* that life and limb will be placed in danger, a duty of care exists even in the absence of privity and liability results in the case of persons injured by reason of such negligent construction \* \* \* ", but this agreement must be qualified by adding thereto these words from Judge Cardozo's opinion in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1053, L.R.A. 1916F., 696:

"It is possible to use almost anything in a way that will make it dangerous if defective. That is not enough to charge the manufacturer with a duty independent of a contract \* \* \*. *If danger was to be expected as reasonably certain,* there was a duty of vigilance, and this whether you call the danger inherent or imminent." (emphasis supplied.)

My difference with appellee arises, therefore, not out of the general statement or application of the rule but out of the state of the evidence here to which he seeks to apply it. In short, it seems clear to me beyond any question that under the evidence in this case, taken, as it must be, most favorably for the plaintiff, the jury could not reasonably find that the defendant had been "proven negligent under the invoked rule.

Our attention has been called to no legislative enactment or decision of the State of Alabama which determines that the evidence here presented establishes a violation of the rule. The American Law Institute Restatement of the Law of Torts, Sec. 285, states the rule applicable here as follows:

"The standard of conduct of a reasonable man \* \* \* (b) may be applied to the facts of the case by the trial judge or the jury, if there be no such legislative enactment or judicial decision."

and in the comment which follows the section quoted, it is said:

"(e) Function of trial court. If there is no legislative enactment covering the circumstances of a particular case and there is no decision of an appellate court which establishes whether particular conduct is or is not negligent, a trial judge may withdraw a case from a jury whenever the jury could not reasonably find the defendant's conduct to be negligent."

As I understand it, the rule stated in the Restatement is the same in substance as the general rule in Alabama and in the Federal Courts concerning motions for directed verdicts. Under the proof in this case, considered from the standpoint as well of what the evidence failed to show as to what it did show, it seems quite clear that the jury could not reasonably have found: (1) that *"danger was*

*to be expected as reasonably certain"* so as to bring the contractor within the rule imposing a duty of vigilance with respect to the particular length of particular screws to be used in the door handle; and (2) that if there was such a duty of vigilance, the contractor failed to discharge that duty. I know that it has become the fashion in some quarters to consider that a trial by jury means a trial by jury alone in which the jury determines not only what the facts are but whether they are sufficient as matter of law to make out a case. This is not yet the rule in the State Courts of Alabama, nor is it the rule in the Federal Courts of that state and this circuit.