**NASHVILLE BRIDGE COMPANY,**
**Appellant,**

v.

**Otis Hillary RITCH, Appellee.**

**No. 17890.**

United States Court of Appeals
Fifth Circuit.

March 15, 1960.

Rehearing Denied May 23, 1960.

Frank M. Young, Birmingham, Ala., Spain, Gillon & Young, Birmingham, Ala., of counsel, for appellant.

Robert S. Vance, Birmingham, Ala., Hogan, Callaway & Vance, Birmingham, Ala., of counsel, for appellee.

Before TUTTLE, CAMERON and WISDOM, Circuit Judges.

CAMERON, Circuit Judge.

This appeal presents the question whether the record contains sufficient evidence to warrant submitting to the jury by the court below appellee Ritch's action against appellant Nashville Bridge Company for personal injuries sustained by him as the result of the capsizing of a railroad car, in which he was performing duties for the consignee in connection with the unloading of a steel girder weighing approximately twenty-seven tons. Appellee charged that appellant was guilty of negligence when it loaded two large girders into a gondola railroad car by placing them substantially against the sides of the car instead of loading them at or near the center of the car.

The action was brought against appellant along with Southern Railway Company, owner of the car, and Louisville and Nashville Railroad Company, the carrier which transported it from Bessemer to Gadsden, Alabama. The court below directed a verdict in favor of Southern, and the jury returned a verdict in favor of L. & N. Its verdict was against appellant in the sum of $58,000.00 which, under the court's conditional ruling upon motion for new trial, was reduced by remittitur to $30,000.00. The appeal is from a judgment entered against appellant for that amount, no appeal being taken from the judgments in favor of the two railroad companies.[1]

Appellant had loaded the girders at its plant in Bessemer, Alabama into a 52 foot gondola car weighing 59,500 pounds. The girders were forty-nine feet eleven inches long and the larger one was seven feet ten inches high, weighing substantially twenty-seven tons. The smaller

1. Industrial Steel Erection Corporation, consignee in the shipment of the two girders and the employer of appellee, intervened to assert its claim against appellant for monies it had paid appellee under the Alabama Workmen's Compensation Act, Code 1940, Tit. 26, § 253 et seq., and the jury returned a verdict in its favor for the amount so paid. The judgment entered on this verdict was set aside upon appellant's motion for new trial, the court holding that Industrial was guilty of negligence as a matter of law in the unloading of the girders, which barred its right to recover from appellant. No appeal was taken from that judgment.

girder was six feet ten inches high and weighed about twenty-four tons. Each girder had a flange on each side and the girders were loaded on edge, about one and one-half inches from the opposite sides of the car.

The girders were held in upright position by connecting the top of each to the bottom of the other by steel angle irons forming an "X". The girders were pressed against one end of the car and were braced at the other end by lugs of angle iron welded to the bottom of the car.[2]

Before the first girder was loaded by appellant, the car was shored up on that side, the brace being removed when the loading of the second girder brought the load substantially into balance. The car was inspected by representatives of the railroad and no exception was taken to the manner of loading. It was transported without incident by the L. & N. Railroad Company from Bessemer to Gadsden, Alabama, where it was delivered to the plant of Republic Steel Company, where construction work was in progress. Industrial was in charge of the work and unloaded the girders and put them in place on top of steel columns by the use of a large crane.

Appellee was employed by Industrial to assist in the unloading, and he first loosened the girders from each other and from the floor by burning the connecting braces and the lugs by the use of a blow torch. The smaller girder was removed first and was placed by the crane on top of columns already in place in the nearby building. This was accomplished on Wednesday, and the larger girder was left in place in the car until Thursday afternoon when the unloading crew began its removal from the car. Appellee's job was to bolt a lifting lug to the top flange of the larger girder to which the hook or shackle on the unloading crane would be attached. He climbed to the top flange of the large girder, taking with him his tools and the bolts for fastening the lifting lug to it. He walked along the flange to the middle of the girder, put the lifting lug in place, and was lining it up so that the holes in the lug would be opposite those in the flange of the girder. At that moment the car, because of the weight of the girder and the added weight of appellees (about 225 pounds) and of the lug (about 250 to 350 pounds), began to turn over. Appellee jumped towards the side of the car opposite that on which the girder was standing and received the injuries for which suit was brought.

Besides himself, appellee used as witnesses two fellow members of the unloading crew. He also placed upon the stand Bera Vance and Joe Robert White as expert witnesses.[3] Vance was an iron worker, living at the time in Birmingham, Alabama, whose experience had extended over a period of about thirty-five years. He had been back in Birmingham about two years after spending considerable time in the northern part of the United States, mainly in the Detroit, Michigan area. During that time he was engaged in handling an average of about fifty heavy girders per year. He had worked for a time directing the loading of girders, but most of his work had been spent in unloading.

2. In the testimony and the statement of facts in appellee's brief, it was shown that when the car arrived at destination, one or more of the lugs had been torn loose, permitting the girders to shift slightly. Appellee's brief does not argue that this shifting contributed in any way to the appellee's injuries, so that this feature will not be dealt with further.

3. Appellee also introduced a car repair helper of L. & N. Railroad who had examined the Southern car in which the shipment had moved, about two years after the movement. The court limited his testimony largely to the case against Southern Railway Company. The only testimony which could be of probative value as between appellant and appellee was his statement that the distance from the center of the car trucks to the center of the side bearings "where the load is supposed to rest on the center plate on the bolster of the car" was 24 inches. From that point to the outside of the gondola car was 33 inches.

In response to a hypothetical question in which was included reference to a picture not identified in the question, and over the objection of appellant, he was permitted to testify that in his opinion, the loading of the two girders along the outside edges of the car was improper.[4] Upon cross-examination he stated that different manufacturers and shippers had different methods of loading girders; and further that a girder loaded as was the one which caused the injury could have been removed from the car by shoring it up—although he had never seen this done except where a much heavier object such as a big crane was being taken out of the car.[5] He further testified that it was customary for the shipper to send special instructions if there were any special precautions to be taken in the process of unloading a freight car.

The witness White qualified as an expert in mechanical engineering, having recently taken courses at two Florida universities and having almost reached the point of receiving his degree. He had been employed by appellee to construct a model based upon information given him by the attorney in addition to evidence assembled by him in talks with others. He constructed a model of the railroad track, the gondola car and the two girders, using a doll to represent the appellee. The entire structure was of wood and it included everything the witness had learned to have been on the car except some minor details such as brakes and braking equipment. The model was set in place before the jury and various jurors were permitted to touch the large girder after the small one had been removed, and to demonstrate that the car would turn over by the addition of the weight of the doll. The witness testified that the added weight of appellee when

4. "A. In other words, with his car loaded with these two girders to the outside of the car would be improper. Is that the question? Would it be or would it not be?

\* \* \* \* \* \* \*

"A. Well sir, if I was loading the car.

"Mr. Young: We object to that.

"The Court: Well I sustain that. They are just asking for your opinion.

"A. My opinion is that it was improper.

"Q. All right, sir. Explain why? A. Well, in loading any car a guy is going to try to get the center of his weight as near the center of the car as possible."

He repeated the same idea later in his testimony: "In other words, loading anything a guy would try to keep the center over the center of gravity."

5. "Q. In other words, the shipper loads them and then the person to whom it is being shipped unloads them? A. Right.

\* \* \* \* \* \*

"Q. You know what you are doing when you load it? A. Yes, sir.

"Q. \* \* \* And different manufacturers and shippers of these things have different methods of loading them, don't they? A. Yes, they do.

"Q. And one company will think one way is the best and you go over to some other company and they think their way is the best, don't they? A. Well, I imagine everybody thinks his own idea is the best.

"Q. And they generally use their own system. He says that is right. He nodded his head. And when it comes out to the job site you or somebody else who is trained in that business is there to unload? A. Yes, sir.

"Q. And whether you know anything about that or not you consider that you are skilled in that work, don't you? A. I do.

"Q. And you know the responsibility is on you when you unload, don't you, you know it is your responsibility, don't you? A. Sure.

"Q. Of course you know that at any time you deal with heavy objects of that type of moving them around or crawling around on them there is always a possibility of getting hurt too, don't you, Mr. Vance? A. Yes.

"Q. And you always try to avoid being hurt I am sure, don't you, Mr. Vance? A. Right.

"Q. That is right. And I believe you said of course as everybody knows and you know, if anybody puts enough weight on the side of a car eventually if you just keep putting it up there you are going to reach the straw that breaks the camel's back and it is going to turn over. You know that, don't you? A. Yes.

"Q. And you know that there is a way of preventing it from turning over by putting these blocks up under the side that the weight is on. You know that, too, don't you? A. That would stop it."

he mounted the large girder was what, in his opinion, caused the car to overturn.

Upon cross-examination he admitted that it would be more difficult to fasten the girders to the car if they were placed at or near its center and that if, being so placed, they should break loose, they might cause the wrecking of the train.

The only witness used by appellant was J. W. O'Neal who was in 1956 General Superintendent of Industrial Steel Erection Company. He had for about sixteen years been engaged in fabricating and shipping steel and also in erecting it, and he represented his company in supervising the performance of the contract to erect the steel structure for Republic Steel. His plant was at Chattanooga, Tenn., and he testified that it was usual and customary in the territory in which Chattanooga and Gadsden are located to load similar girders just as appellant had loaded these; and that it was necessary to shore up the side of the car where the first girder was being loaded to sustain its weight until it should be balanced by the loading of the second girder. The work supervisor on the Republic job was a man who had been with Industrial only three months. After the injury to appellee O'Neal adopted the plan of shoring up one side of the car when unloading heavy girders or other objects and he stated that the materials for doing this, in the form of large timbers, were available close by the unloading site at the time the accident happened.

Appellee introduced in evidence three sets of sworn answers of appellant to interrogatories addressed to it by appellee. By these answers it was proven that the car was properly loaded with the girders; that, as customary, the side upon which the first girder was loaded was shored up with timbers; and that there was nothing unusual about the loading

and, therefore, the consignee was not given any suggestions concerning the unloading of the car: "This was left entirely to the consignee who were reputed to be qualified and experienced steel erectors." The answers further revealed that appellant had been loading girders of comparable size and weight over a period of years, the average for the last twenty-five years being fifty to one hundred large girders per year.

At the conclusion of appellee's evidence, appellant made a motion for a directed verdict on the ground that appellee's evidence failed to show that he was injured as the proximate result of any negligence on appellant's part, and further that the evidence affirmatively showed that appellee was guilty of contributory negligence. Ruling was reserved on the motion and at the conclusion of all of the evidence, it was denied. The court also denied appellant's motion for judgment notwithstanding the verdict.

■ Appellant contends on this appeal that there is no substantial evidence of negligence on its part which proximately contributed to plaintiff's injury. We agree with this contention. We think that principles which are decisive of this case were announced in the recent discussion of this Court in United States Steel Corporation v. McCraney, 5 Cir., 1958, 257 F.2d 457. In that case, McCraney received injuries by the falling of a stake upon him while he was in a gondola car assisting in the unloading of large steel pipe. We reversed the judgment in McCraney's favor and rendered judgment in favor of the Steel Corporation in response to four contentions of the Corporation.[6]

It is true that our decision in that case was based in part upon proof that the loading was in accordance with the rules

6. Points (1) and (2) were based upon the Corporations' contention that the loading had been done in obedience to the rules of the American Association of Railroads. Points (3) and (4) were thus stated:
"(3) that the evidence shows as matter of law that the accident was caused by conditions arising after the loading and

railroad journey of the car, which operated as effective and intervening factors, after loading and consignment, for which the appellant had and could have no responsibility; and (4) that the effect of the judgment is to impose upon appellant as a shipper of the goods the liability of an insurer."

of the American Association of Railroads; but it is equally clear that the decision is based upon the other contentions of the Steel Corporation and that it would have been rendered even if the rules of the American Association of Railroads had not been a factor in the case. We quote at length from the case (257 F.2d at pages 460–462) language showing that our reversal of the judgment of the court below would stand independent of the proof of observance of the Association rules:

"* * * appellant insists that the judgment should be reversed both because defendant proved compliance with the official rules and plaintiff failed to prove that defendant was guilty of negligence in loading the car, and because if there was negligence, it was not the proximate cause of plaintiff's injuries.

"Urging upon us that the evidence shows as matter of law that the acts and conduct of plaintiff's employer and plaintiff, in failing to take proper precautions and in using unsafe and improper unloading methods, was in law and in fact the cause of plaintiff's injury, appellant points with conviction to the uncontradicted proof [that steps were not taken by plaintiff's employer which would have prevented the injury] * * *

"* * * appellant * * * presents the further argument that if in any respect the loading was not as matter of law entirely proper, the injury claimed was not foreseeable and, therefore, did not in law proximately result therefrom because the loader was entitled to assume that the consignee would make proper arrangements and have proper precautions taken against injury, * * * and, if these had been taken the injury would not, indeed on the undisputed evidence could not, have occurred.

* * * * * *

"A careful examination of the record, as the briefs present and discuss it, and of the cases cited and relied on by both parties convinces us: that no case for a jury was made out; that a verdict should have been directed for the defendant; and that the judgment should be reversed. This is so * * * too, because, under the undisputed evidence, there was no latent or hidden defect in the loading, and if the slightest precautions with regard to the stake which fell on plaintiff had been taken by plaintiff's employer and by him, * * * the injury could not have occurred. Appellant was entitled to assume that reasonable care would be exercised by the consignee and his servants and agents in unloading the car, and, as matter of law, defendant could not have foreseen that the loading, which had no hidden or latent defects and which had fully served its purpose to keep the load in place and bring it without injury to its destination, could be a cause of harm to the employees of the unloader. We think, in short, that under this evidence, which showed conclusively and as matter of law that the use of a simple precaution such as taking the stakes down before all of the pipes which held them in place were moved, would have prevented the injury, the principle to be applied here is that the duty of care imposed upon the defendant was to load the car so that, when it reached destination, there would be no hidden defects in the loading, and that the consignee could, by the exercise of proper care, safely remove the lading. It owed no duty to the unloaders to see that in unloading proper safety measures were taken; this duty rested on the consignee and its employees. To hold otherwise would, in our opinion, be to impose upon the loader the responsibility of an insurer."

After discussing the Comparative Negligence Statute of Mississippi, Code 1942, §§ 1454, 1455, we further stated:

"The issue of the case presented here, however, does not turn upon

the contributory negligence vel non of the plaintiff but upon the negligence vel non of the defendant, which includes the foreseeability of the event. Under settled law, the loader of a shipment has the right to assume that the consignee or those who are in charge of the unloading for him will take proper precautions to avoid injury, and where, as here, it appears that plaintiff's injury was not due at all to negligence in the loading but solely to the failure of plaintiff's employer and of the plaintiff to take proper precautions in unloading, it must be held, as matter of law, that defendant was not negligent."

The facts of this case resemble the facts of McCraney so closely that it is not possible to apply the principles of McCraney to the facts before us without reaching the same result as we reached in that case. It was undisputed here that the girders were placed in the car in such a manner that they withstood the transportation without harm or complications; that the consignee was experienced in unloading heavy steel girders and that appellant was advised of this fact; that the girders themselves did not cause the injury to appellee; that appellee was injured solely because of the method employed in unloading the car; and that it was perfectly feasible to unload the car without risk of such injury. Appellee, along with his expert Vance as well as every other witness asked about it, testified that even if the smaller girder should be removed first—a fact of which appellant was not advised—the removal of the larger girder could have been made perfectly safe by shoring up the side of the car where this tremendous weight was resting without the counter-balance which the removed girder furnished. It is equally true here, as in the McCraney case, that there was nothing hidden about the manner and method of loading the girders or that they were both along the outside edges of the car, so that their weight was entirely beyond the body bolsters and the trucks which supported the car. And appellee, along with his witnesses, testified that the car "sagged" under the heavy girder after the smaller one had been removed. It was further uncontradicted that the method of loading adopted by the appellant was that then in general use in the territory where the shipment was made and handled. The only testimony to the contrary was that of Vance and it was based upon experiences in places far remote from the section of the country in which the shipment was made and unloaded.

The testimony of Vance that the shipment was not properly loaded, if admissible at all, was not of substantial probative value sufficient to support a jury verdict. When pressed for the basis of the statement, the only thing he would say was that "in loading any car a guy is going to try to get the center of his weight as near the center of the car as possible." In a recent case arising in Alabama, we held that the testimony of two witnesses that screws used in fastening a handle to a door were "not of the proper size" was not sufficient to warrant submission to a jury a case based on such insubstantial testimony. E. I. duPont de Nemours & Co. v. Kissinger, 5 Cir., 1958, 259 F.2d 411, 414.

■ Although appellant staked its chief reliance upon McCraney, discussing it on ten pages of its brief, appellee devotes very little space to his effort to distinguish that case from this one.[7] We

---

7. His effort to do so is in these words:
   "Appellant relies heavily on the recent case of United States Steel Corp. v. McCraney (C.C.A. 5, 1958), 257 F.2d 457. * * * The question decided by this court concerned only the defendant's negligence. The Court held that defendant was entitled to a directed verdict, because ' * * * the car was loaded in accordance with the rules of the American Association of Railroads, [adopted pursuant to statute] and therefore was not negligently loaded.' As a second reason the court stated that the car was properly

agree with appellee that his statement is an over simplification and we feel also that it is lacking in merit. There was no more proof of negligence in this case than there was in the McCraney case. The evidence of negligence upon which appellee mainly relies is the testimony of the witnesses Vance and White.[8] The most that can be said of Vance's evidence, taken as a whole, is that different shippers used different methods of loading; that each shipper thought his method was best; and that Vance thought any method of loading except his own was improper. Impropriety, according to the opinion of one such witness, is not sufficient to establish liability. It is not enough to prove that other shippers used other methods and thought them to be best. Appellant was not an insurer, as appellee seems to contend in most of his argument.[9]

The burden remained upon the appellee throughout to establish by competent and substantial evidence that appellant did not exercise reasonable care, based upon the standard of what the average prudent man would have done under the circumstances then existing, to load the girders in a reasonably safe manner for unloading by a consignee skilled in such practices and exercising reasonable care in their execution.[10] Appellee's evidence simply fails to establish such a standard of care or appellant's failure to conform to it.[11]

While not stressing the contention that McCraney is not dispositive of this case on the ground that it was decided under Mississippi law, or pointing out any specific difference between that law and the law of Alabama, which controls here, appellee does rely extensively upon the Alabama case of Edwards v. Southern Railway Co., 1936, 233 Ala. 65, 169 So. 715, 106 A.L.R. 1133. While some isolated language of the opinion of the Supreme Court of Alabama seems to be favorable to appellee's case, on the whole Edwards stands as better authority for appellant. Particularly is this true when it is read in connection with this Court's opinion

loaded, there was no hidden defect and that the simple precaution of removing the stake would have prevented the injury. Since injury resulted solely by reason of the failure of the plaintiff and his employer to take proper unloading precautions, there was no negligence which proximately caused plaintiff's injury as a matter of law.

"At the risk of over simplification we point out that the distinction between the present case and the McCraney case is that the evidence here proved Ritch's case, while in the McCraney case it did not. In McCraney the car was loaded in accordance with rules which are sanctioned by statute and as a matter of law was not negligent. It is significant that here no effort was made to show compliance with such rule. Except for a half-hearted attempt by the presentation of the friendly witness, O'Neal, no effort at all was made to dispute Ritch's evidence to the effect that the loading was improper and in such condition that unnecessary danger was inevitable. In McCraney the danger resulted solely from employee's failure to take reasonable precautions in the handling of a proper load. Here Ritch's action would have been entirely safe, reasonable and proper if the girders had been properly loaded."

8. The testimony of White was of little or no efficacy towards establishing negligence. It was rather a demonstration of the obvious. It was undisputed that the car, which remained for more than twenty-four hours with the larger girder standing on edge at or against its side, was so balanced that the addition by appellee of five hundred pounds of weight caused it to overturn.

9. Although at places admitting that negligence was the basis of his action.

10. Kissinger, supra, 259 F.2d at page 414, and McCraney, supra, 257 F.2d at page 462.

11. Appellee makes much of appellant's failure to prove that the girders were loaded according to standards set by the American Association of Railroads. Even as to this nonessential item of proof, the burden was upon appellee to establish such non-observance if he intended to rely upon it as an ingredient of negligence.

in the same case six years earlier, Southern Railway Co. v. Edwards, 5 Cir., 1930, 44 F.2d 526.

The administratrix of Edwards had recovered a judgment in the United States District Court for the Northern District of Alabama based upon "the alleged negligent failure of appellants to warn the consignee or the deceased, an employee of the consignee, of the alleged danger to the consignee or any person attempting to unload a carload of telephone poles resulting from the standards or stakes used on the sides of the car being too few or too weak." This Court reversed the judgment using this language:

"We are aware of no valid reason for holding that a carrier is under a duty to give notice or warning of a condition which is so visible that any danger therefrom must be apparent to and appreciated by a person of ordinary intelligence, prudence, and experience who undertakes the unloading of a car.

"Whatever danger there was to one undertaking to unload the poles from the car, due to their condition when they were ready to be unloaded, was of a kind as likely to be appreciated by a person of ordinary intelligence, prudence, and experience who might reasonably be expected to take part in the unloading as to any one acting for the shipper or the carrier. * * * It seems that it may be inferred that that danger might have been avoided by putting suitable side supports in the cuffs which had been left vacant on the side on which poles were not intended to fall, by bracing the load on that side with a prop or props resting on the ground * * *."

The Edwards estate thereafter proceeded with a suit in the Alabama courts, which resulted in a denial of recovery by the Supreme Court of Alabama in the decision above cited. The denial was placed, however, upon that court's finding that Edwards had been guilty of contributory negligence as a matter of law. That portion of the opinion is in these words (169 So. at page 719):

"In Southern Ry Co. v. Edwards, [5 Cir.,] 44 F.2d 526, the Circuit Court of Appeals held that any risk attaching to the unloading of a car of poles by reason of a visible condition was, as between employee and employer, assumed by the employee; that under the undisputed evidence the negligence of the deceased in unloading the poles caused or proximately contributed to his death, precluding recovery against the carrier or consignor; that whether there was or was not a practicable way of avoiding the danger that overtook him, the deceased was negligent in incurring a danger which was open and apparent, done with a full knowledge of the situation, and which he voluntarily dealt with and which visibly involved his peril. We conclude as to this phase of the evidence that it was without conflict, and showed that it was the negligence of the deceased that proximately caused or contributed to his injury and death. This result prevents the asserted right of recovery. * * * *"

Before announcing that conclusion, however, the Supreme Court of Alabama discussed at length the question of assumption of risk which had been included in our decision supra as one of the bases for rejecting the Edwards claim.

Appellee's brief quotes from the opinion of the Supreme Court of Alabama these words: "The shipper was under duty to load the car in a safe condition for receipt by the consignee or its servants; and if such was not the fact or condition, it was the shipper's duty to notify the consignee or its servants of such danger." This language would seem to imply that the shipper was an insurer of the safety of the load, but appellee specifically disavows such a contention and admits that the basis of his suit is negligence.

This language of the Alabama court (169 So. at page 717) is significant: "The rules for giving or refusing general affirmative instructions need not be repeated. * * * The scintilla rule prevails in this state. * * * The rule that obtains in federal courts in this connection does not apply in this jurisdiction. Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231; A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597. * * * "

This Court has recently stated the same rule in a case applying Alabama law, Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443, 445:

" * * * In diversity cases, therefore, even since Erie, the scintilla of evidence rule prevailing in Alabama and in some other states has no application in the federal courts.

"In determining whether there is sufficient evidence to take the case to the jury, a federal judge performs a judicial function and is not a mere automaton. Gunning v. Cooley, 281 U.S. 90, 93, 50 S.Ct. 231, 74 L.Ed. 720. He must determine, 'not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it.' * * * 'The requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict.' * * * "

Whether our decision is based primarily on failure of appellee to prove negligence by substantial probative evidence, upon assumption of risk, or upon appellee's contributory negligence is not important. We conclude, as we did in McCraney, that the evidence before us does not make out a case against appellant.

The judgment of the court below is, therefore, reversed and judgment rendered here for appellant.

Reversed and rendered.