James E. DYAL, Jr., Charles Smith Dyal and Milton G. Dyal, as Substitute Trustees; and James E. Dyal, et al., Appellants,

v.

UNION BAG–CAMP PAPER CORPORATION, Appellee.

No. 17294.

United States Court of Appeals Fifth Circuit.

Feb. 12, 1959.

Julian F. Corish, Savannah, Ga., Corish, Alexander & Shea, Savannah, Ga., of counsel, for appellant.

George W. Williams, Savannah, Ga., Bouhan, Lawrence, Williams, Levy & McAlpin, Savannah, Ga., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

This action was brought by Union Bag-Camp Paper Corporation[1] against members of and Trustees for the Dyal family[2] for a declaratory judgment de-

[1] Hereinafter called Union, lessee, or appellee.

[2] Herein referred to as the Dyals, lessors, or appellants.

termining the meaning of two long-term timber leases given by the Dyals to Union, and the rights of the parties thereunder and for general equitable relief. The Dyals filed an answer to the complaint, including therein a counterclaim asking the court below to determine the rights of the parties in a way opposite to Union's prayer, and also asking for a declaration as to Union's right to "clear-cut" damaged areas, and for a money judgment for the value of certain timber removed by Union on the claim that it had been damaged by fire and beetles. The court below granted Union's motion for summary judgment (not accompanied by affidavits or anything beyond the pleadings), basing its action upon the pleadings, including the motion and the Dyals' objections thereto; and the Dyals have appealed from the summary judgment entered by the court below.

The lease exhibited with Union's complaint [3] covered substantially 40,000 acres of land in two Georgia Counties, gave Union complete control over the land for the period of the lease for the removal of timber and the exercise of other rights set forth in the lease; denied Union the right to cut timber, except for certain listed purposes, for seven years; and limited its right thereafter to the removal of such timber as would represent the normal growth, which the parties fixed by a formula hereinafter quoted amounting to 19,642.-72 cords each year during the first five years following the seven when normal cutting was prohibited.[4] Union was also given the option to purchase the lands for $15.00 per acre under terms set forth in the lease.

The lease required Union to pay all taxes assessed during its life, to pay annually into a Forest Management Fund five cents per acre, which Union was to expend in maintaining fire lanes, fire warden service, and sound forestry practices; also to pay "as rental for the said described land and premises, annually, in addition to the above expenditures, an amount equal to five percent interest on a value agreed upon for the purpose of this contract * * * of $15.00 per acre; that is to say, the rental for the term of this lease shall be seventy-five cents per acre per year, payable in monthly installments of $650.00."

The essence of what Union acquired, therefore, was the right to remove from the lands the "computed and estimated growth of the entire tract" for a period of ninety-two years (i. e., the ninety-nine

---

3. There were two leases dated Dec. 30, 1941 and amendatory contracts of Dec. 28, 1951 and Dec. 28, 1953, but the parties agree that their writings may be treated as one lease, and the singular, i. e., the lease, will be used in referring to the four documents.

4. The general terms of the granting and habendum clauses are thus set forth in the lease:

"That the Lessor in consideration of One Dollar ($1.00) * * * and in further consideration of the other agreements hereinafter set forth, has granted, leased and demised * * * unto the Lessee, Union Bag & Paper Corporation, the following described lands and premises, to-wit: * * *.

"Together With All And Singular the complete and exclusive use and control of said lands and the rights, members, hereditaments and appurtenances thereof, including * * * all timber, logging, wood, turpentine and naval stores, oil, mining, mineral, water, water power, grazing, farming and hunting rights, and all rights of way, ways, privileges and easements in and over said lands which may be useful, convenient or necessary in the conduct of Lessee's business thereon; * * * and also the right to cut, use and remove any timber and trees, fuel, wood, undergrowth, brush or earth, the cutting, using or removal of which may be useful, convenient or necessary in the cutting, handling, removing, processing, or manufacture of timber, trees and other products of said land, or in exercising any of the rights granted hereunder, * * *.

"To Have And To Hold the said described land and premises unto the Lessee, its successors and assigns, for and during the full term and period of ninety-nine (99) years from the date hereof, with the right to use, work and remove the trees, timber, and other products and deposits thereof, as herein provided. * * * *"

year term less the seven year period when Union was not to remove any timber under this basic right), which the parties agreed would amount to 19,647.72 cords each year for five years, with the right by Union to have new cruises made at five year intervals to ascertain whether the computed and estimated growth would be greater or less than 19,647.72 cords.[5] This basic right purchased and owned by lessee will be referred to as "normal" removal or cutting.[6]

In addition to this basic right, Union was given certain additional rights to remove timber, operate naval stores business, etc., and it assumed certain obligations which will be referred to generally by the use of the term "extras." Paragraph 4(a) of the lease covering operations during the first seven years, whose terms are copied in the margin,[7] furnishes a good example of these extras. The same provisions concerning extras continued in effect during the entire term of the lease.

It is clear from this and other like language in the lease that Union assumed the duty, over the entire ninety-nine years, of providing fire lanes, observing protective measures such as the removing of damaged trees, scientific thinning, and other practices which would tend to enhance the growth of the main timber crop. It also had the right during the first seven years, as well as during the succeeding years, to cut such timber as was reasonably required for building and construction purposes, for the establishment of roads and rights of way, and for obtaining fuel wood for its naval stores operations. The timber cut in the performance of these obligations and the exercise of these rights was clearly in addition to the normal cut above described. From the quoted portions of the contract and from its terms as a whole, it is further clear that Union was to have the right of selection, that is, to determine which trees would be removed in the performance of normal, as well as extra cutting. This, as well as all of the other rights and duties of Union, was to be performed in keeping with sound forestry practices.

The case was heard by the court below on the complaint with its exhibits and the answer and its exhibits, together with appellants' counterclaim. Sharp issues were presented as to the meaning of the written instruments exhibited with the pleadings as to whether Union had the right of cumulative cutting, whether

5. The terms of the lease governing this normal cutting are thus expressed:

"After the first seven years' life of this lease, the lessee agrees that it will not cut, haul or remove any timber from the said property during the life of this lease in excess of the computed and estimated growth of the entire tract since the end of the first seven year period, * * *.

"For the purpose of establishing a standard, it is agreed between the parties that the growth shall be computed at the rate of one-half cord of pulpwood per year per acre over the entire tract during the period of five years next ensuing after the expiration of the first seven years' period. At the end of the said five years' period the lessee may at its option cause a cruise to be made * * *, and, in that case, during the period of five years then next ensuing, shall not take from the land wood in excess of the rate of growth per acre per year shown by the cruise so made to have taken place during the preceding five years, whether greater or less than the rate of growth herein fixed. Thereafter at intervals of five years the rate of growth may be determined * * * in the manner last above stated * * *." [Emphasis added.]

6. Under this portion of the lease Union could remove saw logs figuring 400 feet of saw logs as the equivalent of one cord of pulpwood.

7. "4(a). During the first seven years' life of this lease the Lessee agrees that it will not cut, haul, or remove any timber from said property, except * * * such as is reasonably required for or by reason of building and construction purposes on said lands, roads, right of way, fire laning, protective purposes (such as the removal of damaged trees, scientific thinning, and like purposes tending to enhance the growth of the main timber crop) and fuel wood, for use in connection with turpentine operations on the land * * *." [Emphasis added.]

damaged trees should be deducted from the normal removal to which Union was entitled, whether Union was obligated to pay for the damaged trees and at what price, and whether generally Union had observed standard forestry practices in the removal of the damaged trees and the general performance of the lease terms.

■ The summary judgment rendered by the court below, based entirely upon the pleadings and exhibits,[8] is functionally the same as a judgment on the pleadings. Rules 12(c) and 56 F.R.Civ.P., 28 U.S.C.A.; Dunn v. J. P. Stevens & Co., 2 Cir., 1951, 192 F.2d 854, and 6 Moore's Federal Practice, Second Edition, page 2064. It will be seen from this quotation from the judgment that the trial court held that, as a matter of law, cumulative cutting was allowed under the lease, that any damaged trees cut by Union and salvaged for commercial purposes should be deducted from the normal removal by Union, and that the Dyals were not entitled to payment for the value of the damaged trees so removed, under its holding that they were included in the normal cutting to which Union was entitled under its cumulative cutting privileges.

The Dyals appeal, denying that Union had cumulative cutting rights and claiming that they were entitled to collect for the value of the damaged trees removed and asserting also that the areas from which the damaged trees were taken had been "clear cut" in derogation of accepted forestry practices, and that Union had failed in other respects to observe such practices.

■ We agree basically with the holding of the court below on the fundamental question of cumulative cutting; that is, that Union could, if it failed to cut during any calendar year the estimated growth of one-half cord per acre, make up the deficit by cutting more in subsequent years, provided such cutting was performed according to sound forestry practices and within a reasonable time thereunder. It was paying the Dyals a rental based obviously upon the ascertained growth of the timber and the writings contain no requirement, express or implied, that the growth of each calendar year should be removed during that year or otherwise be forfeited.

The granting to Union of complete and exclusive use and control of the lands for 99 years, along with all timber, logging, wood and other rights; the absence of any provision in the contract requiring removal at any particular time;

8. Pertinent portions of the judgment follow:

"That the said Leases, as amended, do not limit the Plaintiff, Union Bag-Camp Paper Corporation, to any certain time within the lease periods within which to remove the estimated and computed growth of the trees and timber from the tracts, and permit the Plaintiff to accumulate the cutting rights on the lands described herein so that in the event the computed annual growth, as stipulated and agreed upon, is not removed from said tract or tracts during any calendar year, such deficiency may be made up in any subsequent year or years, so long as the total removals of the Lessee, at any time during the life of said leases do not exceed the total accumulated growth after the first seven years of the period of the leases, i. e. in the event Plaintiff should not have cut and removed from said tract or tracts, the agreed and computed annual growth since the end of the first seven years period, it may accumulate such deficiency and remove same at any subsequent time during the life of the leases.

"That the exclusion from the restrictions of trees and timber 'reasonably required for or by reason of building and construction purposes on said lands, roads, right of ways, fire laning, protective purposes (such as the removal of damaged trees, scientific thinning and like purposes tending to enhance the growth of the main timber crop)' does not apply to trees and timber damaged by fires or insects when such are actually salvaged for commercial purposes in the form of saw logs and pulpwood and that any such commercially utilized trees and timber are properly chargeable against the cumulative cutting rights of the Plaintiff. The exclusion becomes effective as to any such removals only after the cumulative cutting rights of Plaintiff have been exhausted. The exclusion of 'fuel wood' is in a different category as to which the restrictions in no case apply as such removals are to be separately accounted and paid for."

the imposition on Union of duties pertaining to scientific thinning, removing damaged trees and generally protecting the land and timber just as an owner would do, together with the other terms of the contract, all argue in favor of the right of Union to remove the timber in accordance with its reasonable wishes. The amount of the annual growth was fixed by agreement of the parties at a specific number of cords. But this was plainly a mere matter of convenience and covered only the timber's growth, containing no indication or intimation that the removal was to be accomplished according to calendar years. On the other hand, we think that the contract, read as a whole, demonstrates clearly that the parties intended that Union should be permitted to cut the number or cords specified multiplied by the number of years, providing, of course, standard forestry practices were observed.

Appellants base their argument against cumulative cutting chiefly on the fact that the lease payments were made by Union on an annual basis, coupled with the right of the Dyals to accelerate past due payments on an annual basis only. No authority is cited for this position and we do not think that it is sound. Payments by Dyal, based manifestly on the annual growth of the timber, were made on a monthly basis at so much per year. The right to accelerate payments upon default [9] is a part of Paragraph 7 of the lease, which spelled out the various grounds upon which, and the methods whereby, the Dyals could terminate the lease and take possession of the land,— Union possessed no right of termination. Considered in connection with the provisions of the whole lease, it is plain that it had no such meaning as appellants seek to attribute to it.

Nor do we think that the plain intent of the lease before us can be nullified by the facts, set up in the Dyals' answer, that Union entered into other leases with other people on other lands, including a lease with one of the Dyals in 1946, in which Union reserved in explicit terms the right to cut cumulatively. No facts are pleaded and no law cited which would support the assumption that Union, by inserting such a proviso in other leases, could be held to an admission that the right of cumulative cutting was not given by the lease here involved.

■ Another point sharply contested between the parties relates to the removal by Union of large quantities of timber upon its claim that the trees were damaged by fire or insects and that it was compelled to remove them in the exercise of sound forestry practices to protect the live trees remaining. The parties agree that the duty was imposed upon Union to remove such damaged trees, but they differ sharply on the question whether the damaged trees should be charged against Union's normal removal rights or should be counted as extras and paid for separately.

Since the removal of damaged trees was required of Union during the seven years when it was not permitted to take its normal cut, as well as during the remaining years of the lease; and since the volume of such removals could not be foretold and removal was required regardless of volume, it seems clear that the parties intended that such removals should not ordinarily be charged against Union's normal cutting rights. It is easily conceivable that, if the contrary were held to be the intent of the parties, the damaged trees during the entire life of the lease might exceed Union's normal cutting rights, thus limiting its removals entirely to damaged timber. We hold, therefore, that the right of selection of the trees to be cut belonged to Union— subject always to requirements of proper forest management—and that it had the choice to include damaged trees removed in its normal cut or to classify them as extras.

■ The trial court was correct also in holding that the questions of cumula-

---

9. "Upon default in rental payments for a period of sixty days, as herein stated, the lessor may declare them due and proceed to collect at once all rental payments for the remainder of the then lease year, that is to say, to January 1 thereafter next ensuing."

tive cutting and whether damaged trees removed were chargeable against Union's normal cutting rights presented questions of law only, and in deciding them under the motion for summary judgment. A careful reading of the pleadings shows that neither party referred to any matter outside the lease upon which the action was brought,[10] and both parties based their prayers for declaratory judgments exclusively upon the writings exhibited with the pleadings.[11] Neither party points to any issue of fact or claims such an issue to be present as to these two questions, either in the pleadings or in the briefs.

No claim is made with respect to said questions, therefore, that the court below should have resorted to customs of the trade, or construction by the parties,[12] or any like facts attending the relationship of the parties as furnishing possible aid in the construction of the writings. Nor does either party argue that the writings expressing the agreement between the parties were not clear, definite, explicit, harmonious in all of their provisions and free from ambiguity throughout.[13]

■ Under these circumstances, and based upon the present record, the court below was bound, as are we, to look to the terms of the writings, which control if and where they do not harmonize with the pleadings construing them.[14] This is in accord also with Georgia law.[15]

■ But there are other questions disclosed by the pleadings which do present genuine issues of material facts. Union's complaint set forth the claim, for instance, that the maintenance of the lands as productive timber lands would require, in the observance of sound forestry practices, the removal in the ensuing four year period, of a minimum of 100,000 cords of beetle infested timber. The Dyals deny this *in toto*. A controversy exists between the parties as to the amount of timber Union had removed as extras, including removals for scientific thinning, damaged trees, fire lanes, and the other items referred to herein. The Dyals claim that Union was following the practice of clear-cutting areas where damaged trees were present, asserting that this, as well as other practices of Union, were not in keeping with sound forestry management.

One instance of this was the removal by Union of 31,078 cords of wood as damaged and diseased timber after the

---

10. Except the lease between one of the Dyals and Union in 1946 and the other leases discussed above, in which Union explicitly reserved the right to cut cumulatively.

11. Appellants' counterclaim, for instance, contains this prayer:
"That defendants have a declaratory judgment construing the terms of the leases as amended, to mean that the plaintiff is entitled to cut 19,641.72 cords of wood on said entire tract in each calendar year, said amounts of wood being computed under the terms of said leases as an amount equivalent to the estimated annual growth thereon, but that said rights are not cumulative and that any amount of said quota not cut in any particular calendar year may not be cut in a succeeding calendar year, and that the rights of the plaintiff to cut said quota are forfeited upon its failure to do so within the calendar year to which the quota is applicable."

12. Cf. Gulf Power Co. v. Local Unions, etc., 5 Cir., 1956, 229 F.2d 655, and Hem-

ler v. Union Producing Co., 5 Cir., 1943, 134 F.2d 436.

13. Cf. Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658; Major Appliance Co., Inc. v. Hupp Corp., 5 Cir., 1958, 254 F.2d 503; Petroleum Financial Corp. v. Cockburn, 5 Cir., 1957, 241 F.2d 312; and Baker v. Nason, 5 Cir., 1956, 236 F.2d 483.

14. Simmons v. Peavy-Welsh Lumber Co., 5 Cir., 1940, 113 F.2d 812, 813.

15. "Intention of parties must be sought.— The cardinal rule of construction is to ascertain the intention of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced, irrespective of all technical or arbitrary rules of construction." Georgia Code 1933, § 20–702. And cf. North Georgia Co. v. Bebee, 1906, 128 Ga. 563, 57 S.E. 873, 874; and Hendrix v. W. R. Altman Lumber Co., 5 Cir., 1944, 145 F.2d 501.

end of the first seven year period and up to September 1, 1955, which formed the basis of a sharply controverted issue between the parties. The Dyals admitted the removal, but challenged the methods and practices utilized by Union, claiming that the entire amount had been taken by clear-cutting 7,000 acres, whereas proper forestry practices required that Union restrict its removals to "damaged or diseased trees here and there throughout said tract for the purpose of scientific thinning * * * [and] promoting the growth of the main timber crop. This issue cannot be resolved from the pleadings but should, along with those embraced in the other questions here mentioned, be settled by the court upon the evidence adduced by the parties and under the principles herein enunciated.

Another feature of the contract, necessarily involved in the solution of the questions last mentioned, is the inclusion of stipulations by which both parties agree to submit all disputes concerning scientific thinning and forestry management of the property generally, to arbitrators, agreeing in advance to be bound by their findings. Neither litigant mentions the arbitration feature in the pleadings. The effect of these provisions of the contract and whether the parties intend to waive or abandon them in order to submit the whole controversy to the courts and whether they can legally do so should be decided on a hearing by the trial court.

We hold, therefore, that the court below properly disposed of some of the questions presented by Union's complaint and the Dyals' counterclaim, but that it was not possible, on the motion for summary judgment, to render judgment on the whole case because other questions presented issues of fact. It should have dealt with the situation before it as provided by Rule 56(d), F.R.C.P.[16] The order the court will enter upon a new trial ascertaining "what material facts exist without substantial controversy" will be based upon the conclusions herein reached, as well as upon the pleadings then before the court and by interrogating counsel, all as provided in the Rule. A clear guide which the court should follow in further hearing of the case is furnished in our decision in King v. California Co., 1955, 224 F.2d 193, 196, quoting from the prior case of United States Sugar Corp. v. Atlantic Coast Line R. Co., 5 Cir., 1952, 196 F.2d 1015:

"Moreover, there is nothing final in the determination made by the district court. When it hears the case on the merits, it may have a different idea about the impact of this testimony. What we said in United States Sugar Corp. v. Atlantic Coast Line R. Co., supra, applies here: 'Appellant points out that the order appealed from constitutes a determination of the basic question here involved. But the views of the district judge implicit in the order have not yet assumed finality. Until final judgment, he is at liberty to alter them.' " [17]

16. *"Case Not Fully Adjudicated on Motion*. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, * . * * and directing such further proceedings in the action as are just: * * * "

17. Professor Moore develops this thesis fully in 6 Moore's Federal Practice, pages 2309–2311. He quotes at length from the opinion of the Third Circuit in Coffman v. Federal Laboratories, Inc., 1948, 171 F.2d 94, 98, certiorari denied 1949, 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076, wherein it is stated: "Subsection (d) [of Rule 56] simply provides for a method whereby the trial judge with the aid of counsel can point up the controverted issues. It is, moreover, similar to the pretrial procedure provided for in Rule 16 and the matters determined in the issues so framed are not foreclosed in the sense that the judge cannot alter his conclusions." And see also 3 Moore, pages 1130 et seq.

The right of the trial court to permit amendment to the pleadings continues until final judgment. Moreover, its final judgment is required [18] to be entered upon the evidence received at the trial.

The judgment of the court below is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

HUTCHESON, Chief Judge (dissenting in part and in part concurring).

Of the clear view that no case for summary judgment was presented, I dissent from that part of the opinion and judgment which approves and affirms in part the summary judgment granted below, and I concur in so much thereof as in part reverses the judgment and remands the cause for trial.