Ernest W. SHAHID and Margaret P. Shahid, individually and d/b/a Shoreline Hotel and Cottage Colony, Appellants,

v.

GULF POWER COMPANY, Appellee.

No. 18177.

United States Court of Appeals
Fifth Circuit.

June 6, 1961.

Rehearing Denied July 19, 1961.

Walter B. Fincher and Joe Salem, Atlanta, Ga., for appellants.

E. Dixie Beggs, of Yonge, Beggs & Lane, Pensacola, Fla., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a summary judgment in favor of Gulf Power Company, defendant below, and against Ernest W. and Margaret P. Shahid, plaintiffs below. The plaintiffs sought $500,000 damages from the defendant for its alleged negligence in the destruction by fire of the plaintiffs' Shoreline Hotel on April 16, 1956. The questions presented are whether there was any genuine issue as to any material fact as to the defendant's alleged negligence, and whether the defendant was entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A.

The salient facts were these: Plaintiffs' hotel was situated facing Highway 98 and the Gulf of Mexico about fifteen miles east of Fort Walton Beach, Florida, and a little less than a mile west of a substation maintained by the defendant. At the substation the current which was conducted to plaintiffs' premises from the east was reduced to about 12,-000 volts. Plaintiffs' hotel was serviced by wires passing through a transformer situated just off of plaintiffs' premises where the current was further reduced to 208 and 120 volts.

On the morning of the fire, between three and four o'clock, plaintiffs were awakened by loud shouting of a guest accompanied by continuous blowing of his automobile horn. Upon arising they found that the hotel was in total darkness, and upon looking across the road they saw that lights were burning in a nearby establishment, from which they knew that the trouble was upon their own premises. Dressing quickly, they went towards the point where the guest was giving the alarm and found sparks, which they took to be electrical sparks, being emitted from a ground floor storage room through a louvered door. In this room were located the fuse boxes and circuit breakers connected with the hotel's electrical system. The room above, from which some evidences of fire were observed, contained the main switch by which the electrical current into the hotel could be cut off. The electrical equipment on the hotel premises and belonging to plaintiffs led to a goose-necked mast on top of the hotel where defendant's service wires were connected. Soon after plaintiffs arrived downstairs, bright flashing and arcing were observed at and nearby this mast and along defendant's wires where they were connected with the wiring system of plaintiffs.

As soon as they had been able to size up the situation and before much evidence of actual fire had appeared, plaintiff Ernest Shahid, finding all telephones in the vicinity inoperative, drove to Silver Beach, about seven miles away, and called defendant's emergency serviceman Ratliff in Fort Walton reporting the situation and asking that he come promptly and disconnect the electrical wiring. After Ernest Shahid had returned, his wife carried their children to Silver Beach and there by telephone reported the fire to several fire companies in nearby towns.

Ratliff, immediately upon being called by Shahid, telephoned his co-worker Barfield and the two hastily dressed. Barfield drove defendant's service truck to Ratliff's house and picked him up, and they proceeded to plaintiffs' hotel. When they arrived, the arcing at and around the service mast had ceased and the wires to the hotel had been severed and were lying on the ground.

The issues framed by the pleadings and further evidence developed by depositions and affidavits are stated in the opinion of the district court granting the defendant's motion for summary judgment, which opinion is reported in 23 F.R.D. at page 245.

Before rendering summary judgment the district court must determine both (1) "that there is no genuine issue as to any material fact" and (2) "that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Requisite (2)

does not automatically follow from requisite (1).

In Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 540, 27 A.L.R.2d 416, we said:

" * * * before rendering judgment the Court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law. Where, as in this case, the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law."

In Demandre v. Liberty Mutual Insurance Company, 5 Cir., 1959, 264 F.2d 70, 72, we stated that:

" * * * whether the 'facts' stated in the complaint present a 'genuine issue as to any material fact' as F.R.Civ.P. 56 requires is really to be measured by whether no evidence could be offered to support the plaintiff's theory."

In Alabama Great So. R. Co. v. Louisville & Nashville R. Co., 5 Cir., 1955, 224 F.2d 1, 5, 50 A.L.R.2d 1302, we recognized "that as a general proposition the issue of negligence, including the related issue of wanton conduct, is ordinarily not susceptible of summary adjudication."

In Dyer v. MacDougall, 2 Cir., 1952, 201 F.2d 265, 269, Judge Learned Hand pointed out the necessity in some cases of an examination of a witness in open court, "that the immediate presence of a judge in a court-room was likely to make him tell more."

In Subin v. Goldsmith, 2 Cir., 1955, 224 F.2d 753, 758, referred to approvingly by this Circuit in Alabama Great So. R. Co. v. Louisville & Nashville R. Co., supra, Judge Frank stated that:

"Particularly where, as here, the facts are peculiarly in the knowledge of defendants or their witnesses, should the plaintiff have the opportunity to impeach them at a trial; and their demeanor may be the most effective impeachment."

As to whether the first requisite for summary judgment—"that there is no genuine issue as to any material fact" —has been met,

" * * * the court should take that view of the evidence most favorable to the party against whom it is directed, giving to that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. If, when so viewed, reasonable men might reach different conclusions, the motion should be denied and the case tried on its merits."

Ramsouer v. Midland Valley R. Co., 8 Cir., 1943, 135 F.2d 101, 106; see also, 6 Moore's Federal Practice, 2nd ed., p. 2114.

The evidence showed that the defendant furnished the electric power to plaintiffs' hotel. The district court found that:

"Admittedly, the fire was of electrical origin. The depositions of plaintiffs establish that the fire started on the ground floor of the hotel building in a room housing the electrical equipment of the plaintiffs. Plaintiffs state that they saw arcing and sparking in this room, and later on the service lines running from the defendant's transmitter pole to the service mast on top of the hotel, and that, therefore, there must be an inference at least that the fire might have started from some negligence on the part of the defendant."

Shahid v. Gulf Power Company, N.D. Fla.1959, 23 F.R.D. 245, 246.

Mrs. Shahid testified that after all evidences of power over the main switch of the hotel were gone, "it was evident that we were still being fed current and yet

there were no lights on. Q. What was the evidence that you were still being fed current? A. Seeing the electrical arc through from their transformer into our building." R. L. Pulley, defendant's vice president and operating manager, testified by affidavit:

"* * * that any short-circuit or failure between the customers main fuses and the transformers would be protected against by the fuses of the power company on the pole with the transformers; that these fuses upon disintegrating ordinarily cause the hinged holder or 'jack' to drop down, giving a visual indication from the ground that the circuit is open, but the dropping of the holder or 'jack' is not essential to the opening of the circuit, the protection being afforded solely by the disintegration of the fuse; that it would be possible for the holder or 'jack' to fail to drop after the 'blowing' of the fuse due to corrosion or other cause but this rarely, if ever, occurs."

Ernest Shahid testified in part:

"Q. In the first count of your complaint you state that there was a dangerous overload of electricity where the defendant's lines entered your premises. On what do you base that allegation? A. On the basis of the arcing and sparking I saw before I left to call Gulf Power Company up.

"Q. Do you base it on anything else? A. On the shooting coming through that storage room next to room No. 5.

"Q. Do you base it on anything else? A. Not unless it would be on the trouble I had been having with my light bill and the lights dying down and coming up instantly."

Mr. Dawkins, defendant's District Engineer, testified that, "ordinarily arcing on the secondary lines will blow the transformer fuses."

The defendant's lineman, emergency serviceman, Ratliff testified:

"Q. Is there anything at the pole at the Shoreline Hotel which would cut off the current to the hotel in the event of trouble? A. They have jacks there.

"Q. How do those operate? A. They have a fuse in them and when the fuse blows they drop out.

"Q. What would cause a fuse to blow out? A. Shortage on the low side of the fuse would cause them to blow.

"Q. In other words, if there was a short on the Shoreline Hotel side of the transformers it would blow the fuses? A. That's right.

"Q. What would it take in the way of a short to blow a fuse? Can you tell us what sort of condition would have to exist before the fuses would blow? A. No. I could not. There would be lots of different things that would blow a fuse. Just a shortage inside the switch or anywhere in his place would blow our fuse.

"Q. Would you say that would afford some protection to the Shoreline Hotel, then? A. Yes, on a shortage it would.

"Q. You say on a shortage it would. Is there any other thing that would blow a fuse in the jacks? A. Did you mean other things besides a shortage?

"Q. Yes, what I mean, are there other things besides a shortage which would cause the jacks to blow? A. Yes, overload or a lot of things can cause the fuse to blow.

"Q. Assume that there happened to be an overload on the line on this night, at what stage would the jacks function in order to cut off the current, on the overload? A. The same as the other.

"Q. Would the fuses blow in time to save the hotel from a dangerous overload of current? A. They are supposed to.

"Q. If there were arcing between the pole, which I understand is lo-

cated right outside the Shoreline Hotel, if there were arcing from the pole to the hotel, would you say there was a condition of overload or shortage involved? A. Well—

"Q. What would cause the arcing? A. I could not tell you what would cause the arcing between the hotel and the pole. It would blow the fuse also.

"Q. It should blow the fuse? A. Yes, it would blow the fuse that went to it."

The defendant's other lineman and emergency serviceman, Barfield, testified:

"Q. Are there any means whereby the current would cut off automatically in the event of trouble? A. On the transformer pole.

"Q. The jacks they referred to? A. Yes.

"Q. What sort of trouble would it take for the jacks to operate? A. An overload.

"Q. Assuming there was a dangerous overload coming into the Shoreline Hotel, would those jacks, if they were functioning properly, cut off the current? A. Yes, sir.

"Q. Did you make any statement to any one at the scene concerning shooting the transformers with a shotgun or any other kind of gun? A. No, sir.

"Q. You made no such statement? A. No, sir.

"Q. Did you make a statement to any one else concerning the use of a shotgun or some other type of gun? A. No, sir."

Mr. Shahid had testified:

"A. * * * Mr. Barfield made this statement to this Brent Neilson, 'Two well-placed bullets could have ended all of that.'

"Q. Could have ended all of that? 

"A. It could have severed their current from our building.

"Q. How did he happen to make that statement?

"A. Mr. Neilson is noted for his fancy guns, and he saw him there, and he asked him where one of his fancy guns was, and he said 'Why' and he told him."

District Engineer Dawkins testified:

"Q. A statement has been attributed to one Gulf Power Company employee, Barfield, to the effect that he could have shot out the transformers. Is that possible?

"A. Shot out, what do you mean?

"Q. Shot them out.

"A. It is possible."

Ernest Shahid testified that:

" * * * Mr. Ratliff told me the night of the fire when he came out there after Mr. Barfield left me, he came over when I was on this end, and I was talking to Mr. Ratliff, and he told me he could not understand why those jacks didn't kick off, and he said something about using some kind of long thing to get those wires on, but he said he could not understand why those jacks didn't go off. Mr. Ratliff made that statement to me."

Ernest Shahid further testified:

"A. * * * At a later time I asked Mr. Barfield I wondered why those jacks didn't work on the hotel, and he said, 'I truthfully don't know why those jacks didn't work, but if your jacks had worked your hotel would never have burned down.'

"Q. Mr. Barfield said that?

"A. Mr. Barfield made that statement to me the morning of the fire.

"Q. When he serviced the pump?

"A. Yes."

Appellee argues that the purported declarations by Ratliff and Barfield are not competent evidence. We quote from appellee's brief:

"Even if these purported declarations might otherwise present an issue, they are not admissible in evidence.

" 'Competency of the agent to make admissions on the subject is

not alone sufficient; the admission which it is sought to use must have been made in connection with the discharge of the agent's duty, and must be a statement of fact, rather than an expression of opinion.' 31 C.J.S. [Evidence § 343, p.] 1115

"The sole duty of these two employees was to render emergency repairs. They were not authorized to make statements or express opinions binding on the defendant. The statements do not relate to any repair work done by them but to a supposed condition existing before their arrival and with which they had nothing to do, and which required no work or repairs on their part."

█ If the question be considered as involving merely a procedural rule as to the admissibility of evidence, then, under Rule 43(a), Federal Rules of Civil Procedure, the rule, whether federal or state, which favors reception of the evidence governs. New York Life Ins. Co. v. Schlatter, 5 Cir., 1953, 203 F.2d 184, 188; Hambrice v. F. W. Woolworth Co., 5 Cir., 1961, 290 F.2d 557. If, on the other hand, the question turns upon substantive law as to the scope of the agent's or employee's authority (see IV Wigmore on Evidence, 3rd ed., Sec. 1078, p. 119), then the state law would control.

In a recent case involving injuries sustained as a result of falling on stairs immediately inside the door at the service department entrance of a Montgomery Ward & Company store, the District Court of Appeals of Florida, Second District, held that a statement of the assistant manager concerning a sign on the door at the time of the accident was admissible, and discussed the Florida law as follows:

"The courts of this country are somewhat in conflict on the question of whether an agent's statements, which are vicarious admissions against the interests of his principal, are admissible in evidence in an action against the principal by a third party. If such an admission were made by the principal himself, it would be clearly admissible as an exception to the hearsay rule. This question, therefore, turns upon the rules of agency and whether the agent was acting within the scope of his authority.

"We think that in their many conflicting opinions the various courts of this country have developed three different rules. One of these rules allows the evidence if the agent was authorized by the principal to make statements for him concerning the subject matter of the statement. *A second rule will allow the agent's admission if the statement concerned a matter within the scope of his agency and was made before the termination of the agency.* A third rule adds to the former two rules the requirement that the statement be a part of the res gestae. It is very obvious that the first rule is far more strict than the second because it requires the agent to have express statement-making authority. The second rule does not require such authority to have been expressly granted but implies it from the agent's authority or employment with the subject matter of the statement. It is this second rule, in view of the Florida holdings, with which we are concerned.

"In Myrick v. Lloyd, 158 Fla. 47, 27 So.2d 615, 616, we think the Supreme Court of Florida has answered one phase of the defendant's question. In that case a father was being driven on a business trip by his son, who was also his employee, when the son ran over a boy. After the accident the father directed the son to take the boy's parents to the hospital. While en route to the hospital the son told the parents of the injured boy that the accident was his own fault and not the fault of their boy. The Supreme Court held that the son was the agent of the father and the statements of admission made to the parents was

(sic) admissible against the father. The court said, in part, as follows:

" '* * * The best authority, to our mind, is found in Wigmore on Evidence, Vol. IV, Sec. 1078, page 119: "He who sets another person to do an act in his stead as agent is chargeable in substantive law by such acts as are done under that authority; so too, properly enough, admissions made by the agent in the course of exercising that authority have the same testimonial value to discredit the party's present claim as if stated by the party himself."

" 'We recognize a conflict of authority on this question; however we have chosen the above as the more practical and liberal rule. The purpose here was not to prove agency. That fact had already been established. When this statement was made the status of principal and agent continued. It is a fact that the agent was acting pursuant to express authority and direction of the principal when the statement was made. It is also a fact that the statement had reference to matters occurring within the scope of his employment. When so acting the agent was acting for the principal who might have made such an admission himself against his own interest. It is our conclusion that in this case the statement was admissible * *.'

"The court held in accordance with the second rule stated above, and its opinion is ample authority for admission of the statement with which we are concerned, notwithstanding the fact that the statement in the instant case was made nine days after the accident." (Emphasis supplied.) Montgomery Ward & Co. v. Rosenquist, 2 Cir., Fla.App. 1959, 112 So.2d 885, 886, 887.

■ Applying the italicized "second rule," supra, held applicable in Florida, it is not disputed that if the statements were made at all, they were made before the termination of the agency of either Ratliff or Barfield. Ernest Shahid testified that Ratliff's statement was made the night of the fire, and Barfield's the morning of the fire when he serviced the pump. A prima facie case for admissibility has, we think, been made. The scope of the agency of Ratliff and of Barfield may be more fully developed upon the trial. Summary judgment should be refused until the facts have been sufficiently developed to enable the court to be reasonably certain that it is making a correct determination of the question of the scope of agency of Ratliff and of Barfield. See Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 540, 27 A.L.R.2d 416.

The defendant rests heavily on the extensive affidavit of its vice president and operating manager, R. L. Pulley, an expert electrical engineer, and emphasizes the fact that the plaintiffs produced no opinion from an expert and announced that they did not "intend to use an electrical engineer or expert at the trial (other than Wallace Dawkins, an employee of the defendant, to be called as an adverse witness. His deposition taken by plaintiffs is also submitted for consideration in connection with this motion.)" Expert Pulley's affidavit concluded:

"That based on his years of experience and knowledge in the field and the testimony given in said depositions the affiant finds no evidence whatever indicating a failure on the part of the defendant to provide protection to the plaintiffs nor is there any evidence indicative of the transmitting of current in a quantity or a manner that would have contributed to the destruction of the plaintiffs' hotel."

■■ We think that there is applicable here the principle announced by the Supreme Court in Sentilles v. Inter-Caribbean Shipping Corporation, 1959, 361 U.S. 107, 109, 110, 80 S.Ct. 173, 4 L.Ed.2d 142, to the effect that the members of the jury, rather than the expert witnesses, are the ones sworn to make a legal determination of the question of causa-

tion. The plaintiffs are, of course, not bound by their expressed intention not to use an electrical engineer or expert at the trial.

We conclude as we did in Chapman v. Hawthorne Flying Service, 5 Cir., 1961, 287 F.2d 539, 541:

> "Without intimating any conclusions on the merits, and * * * without implying that the plaintiff's proof as it now stands would warrant submission to a jury, we nevertheless conclude that it is the part of good judicial administration for the facts in this case to be more fully developed before the trial court determines that there is truly no genuine issue as to any material fact. Rule 56, Federal Rules Civil Procedure, 28 U.S.C.A.

> "The judgment is reversed for further proceedings not inconsistent with this opinion."

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

I am unable to agree with my Brethren who have decided that the summary judgment entered by the court below should be reversed and this case sent back for a hearing on the merits. I think that a directed verdict will inevitably ensue and that, under the circumstances appearing in this record, the long and tedious hearing upon such a procedure ought to be avoided.

The case is a close one, but I think that is is as important to see that the salutary summary judgment procedures are utilized in proper cases as it is to protect litigants from their employment in cases where the record shows that the party appealing is entitled to such a hearing.

It should be understood that the testimony of every single person who knew anything about the fire was taken by deposition and full right of cross examination offered, except for the affidavit of appellee's vice president, Pulley, which was not controverted or challenged by the appellants even though they had employed experts with the view of using them if their statements had been favorable. The court below, therefore, had before it everything which would be developed in a trial upon the merits, and it found that no negligence had been shown by appellants. This being true, I think we should affirm the conclusions reached by it.

It is helpful to consider at this point exactly what the lower court did say about the failure of the appellants to sustain the burden resting upon them in the presentation to it.[1] It will be found

---

1. " * * * Plaintiffs' complaint consists of three counts. * * *

"The material allegations of the First Count are that defendant Power Company negligently failed to cut off the current after it was notified of fire at plaintiffs' premises, resulting in the destruction of plaintiffs' property by fire.

"*The plaintiffs do not charge the defendant with any responsibility for the origin of the fire in this Count.*

"The depositions and affidavits relied upon by defendant in support of its motion in this regard are in no way disputed by any of the documents relied upon by plaintiffs. It affirmatively appears in regard to this issue as to whether or not the defendant negligently failed to cut off power promptly after notification by the plaintiffs that the facts are not in dispute. The plaintiffs in their depositions aver that the defendant's servicemen were slow in arriving at the scene, but

it is not disputed that the power was already off, and there is no showing that the defendant could, or should, have cut off the power sooner than was accomplished prior thereto by safety mechanisms. This being so, there is not even the possibility of inference that the exertion of more diligence by defendant would have prevented or mitigated the damage. * * *

"Even placing upon the defendant, as the law does, the duty of extraordinary care in the operation of its business and considering the matter here on motion for summary judgment most stringently against the movant, the court concludes nevertheless that there is not even the modicum of evidence necessary to submit a material question of fact to the jury and that defendant's motion for summary judgment should be granted.

"In reaching this conclusion, the court has considered most carefully the case of

helpful, too, to set forth the summary of the argument advanced before us in the brief of appellants.[2]

It is well to recall also that the case was heard by the court below on the second motion for summary judgment in which the appellee relied upon the pleadings, the depositions of the appellants, the affidavit of R. L. Pulley, appellee's vice president, and a list of witnesses furnished by the appellants pursuant to pretrial order, including the statement that they did not intend to produce as a witness any electrical engineer or other expert; and upon the written opposition of appellants to this motion in which it was stated that appellants would rely upon the pleadings, the depositions of the two appellants, and the depositions of four of appellee's employees, including the two servicemen Ratliff and Barfield who were called to the fire.

It is undisputed in the record that the servicemen arrived well in advance of the fire fighting equipment, that the west end of the hotel was generally in flames, that the arcing at and around the service mast had ceased, and that the wires to the hotel had been severed and were lying on the ground. The testimony of appellants that the servicemen came onto the scene slowly and stood around doing nothing is lacking in probative value for the reason that the severance of the wires they had been called upon to effect had already been accomplished.

Soon after the two servicemen had arrived the desire was expressed that the hotel water pump be reconnected so that the water from it could be used on the raging fire. One of the servicemen mounted the pole upon which the transformer was situated and, finding that all of the fuses had disintegrated, re-fused one of the lines and connected it up with the pump, which immediately began discharging water in a normal way.

I deal, first, with appellants' contention that the servicemen did not proceed with reasonable speed in cutting off the electrical current after being advised of the emergency. I think that the court below was correct in holding that there

---

Yelverton v. Adams, decided by the United States Court of Appeals for the Fifth Circuit and reported in 262 F.2d 146. [Here the court below quoted from the decision in the Yelverton case.]

"In the case before this court, we do not have merely strained evidence in support of plaintiffs' contention, we do not have merely weak evidence in its probative force, we simply do not have any substantial evidence of any nature which could give rise even to an inference, from substantial evidence, conjecture or otherwise, that the fire here was due to the negligence of the defendant. In Yelverton there was at least some proof of a jumper wire or other specific condition that the power company in that situation was charged with having failed to detect upon inspection, or having failed to remedy after complaint. Here plaintiffs and their witnesses merely describe certain electrical phenomena from which they wish the jury to be permitted to infer that some unidentifiable dangerous condition existed, further infer that the defendant was responsible for the condition, and still further infer that this condition caused the fire.

"The entire burden of all the evidence before the court in this case compels the court to the view that there is a very obvious distinction between the two cases. To hold otherwise would be to submit to a jury conjecture, inference, speculation without even a jumping off place to reach some kind of a verdict. The mere fact that premises are burned to which electrical current is supplied, standing alone, cannot be the basis for an action in negligence against the supplier of the current thereto. * * *" [Emphasis added.]

2. "The appellants are unable to pinpoint the exact cause of the fire, except that it can be reasonably inferred from their testimony that there were some defects in Gulf Power Company's equipment which caused dangerous amounts of electrical current to come into the hotel, starting the fire and preventing the appellants from extinguishing the said fire. There is also evidence that the Gulf Power Company delayed unreasonably in cutting the current off, and closely connected with that theory of recovery is the proposition that the power company was negligent in failing to provide the consumer an adequate protective devise which would operate to cut off the current in event trouble such as this developed."

was no issue of fact on this point. I pass over the settled principle that estimates, especially under circumstances of stress such as were present here, are not highly probative, Illinois Central Railroad Co. v. Underwood, 5 Cir., 1956, 235 F.2d 868, 873, and cases cited. Disregarding the estimate of time given by the two servicemen and accepting that of appellants, and relating it to the other testimony given by the two appellants, I do not think that there was any substantial evidence that the servicemen were guilty of any unreasonable delay which contributed in any way to the starting of the fire or its spread.

By appellants' own proof, the current serving the lighting system of the hotel, both inside and out, had been cut off by the operation of safety devices before appellants were awakened. Assuming that the testimony of appellants that they discovered arcing and flashing at and near the entrance mast after they had gone into the yard of the hotel tended to prove that current was still being delivered to that point, appellant Shahid testified that, after he had driven to Silver Beach and 'phoned serviceman Ratliff and had immediately returned at high speed to the hotel, the arcing at the entrance mast had ceased. There was no evidence, therefore, that the current had not then been cut off entirely, which was considerably before the servicemen could have arrived; since the appellant Shahid did not have to stop to dress after he telephoned Ratliff, and his return journey was less than half that which the servicemen had to take. This, coupled with the undisputed proof that the wires had separated and fallen to the ground by the time the servicemen arrived, and that when, shortly thereafter, one of them mounted the pole to the transformer, he found that all of the fuses had disintegrated, eliminated the time it took the servicemen to arrive at the scene of the fire after notice, as a significant element in the proof.

Much is made by appellants over statements the appellants claimed to have elicited from Ratliff and Barfield sometime after their arrival to the effect that "had the 'jacks' worked on the night of the fire, the hotel would not have burned." This statement, attributed to Ratliff and Barfield by one or both of the plaintiffs, was described in appellants' brief as "by far the most damaging evidence against appellee."

In describing these jacks, Pulley, who had been chief engineer for appellee for more than thirty years, used these words in his affidavit: "* * * these fuses upon disintegrating ordinarily caused the hinged holder or 'jack' to drop down, giving a visual indication from the ground that the circuit is open, but the dropping of the holder or 'jack' is not essential to the opening of the circuit, the protection being afforded solely by the disintegration of the fuse * * *"

These statements attributed to the servicemen were not, therefore, of any probative value in the court's consideration of the case because, *by introducing the depositions of Ratliff and Barfield unconditionally, the appellants made them their witnesses;*[3] and, moreover, the servicemen were not asked about these alleged statements when appellants' attorney was examining them, so that the predicate was not laid to impeach these witnesses. This is so even if, contrary to the Federal Rule, appellants would have had the right to impeach their own witnesses. 4 Moore's Federal Practice, 2d Ed., pp. 1204–1205, and 5 ib., pp. 1348–1349. Finally, opinions given by the servicemen outside the scope of their agency (which involved only emergency work on the appellee's equipment) would not, if entitled to any consideration at all, have *any effect towards establishing as fact the truth of the matter dealt with in the opinions.* Cf. 31 C.J.S. Evidence § 343, pp. 1113, et seq.

Appellee filed the affidavit of its operating manager, a graduate electrical engineer duly registered in the State of

---

**3.** Rule 26(f) F.R.C.P.

Florida. Substantially five months elapsed between the filing of this affidavit and the hearing of the motion for summary judgment, and appellants failed to avail themselves of the right to cross examine this witness, and failed to offer any evidence contravening what Pulley stated. They admitted that they had consulted and had reports from one or more experts, but they did not offer their testimony. Pulley was acquainted with appellee's equipment at and near the hotel and the installations on its premises. He swore that the transformers, fuses, lightning arrestors and other items of equipment serving appellants' property were all standard equipment which was designed to protect, and did actually protect, appellants from overloading, short circuits and like occurrences which might endanger the electrical system maintained by appellants and their property upon which it was situated. Having heard the testimony of all of the witnesses whose depositions were offered by the parties and being acquainted with the room from which the sparks were said to have emanated, as well as all of the equipment in and around the premises, electrical and otherwise, he gave as his expert opinion that the sparks in the storage room were produced by the gas hot water heater and gas lines within that room; that the arcing and flashing at and near the service mast were the aftermath, and not the cause, of the fire, being the product of fire damage to the insulation of the service wires sufficient to cause short circuits, which in turn blew the fuses on the transformer pole. What he said was not disputed, but on the other hand the testimony of appellants tended to corroborate him.

They had, since the original wiring was installed in the hotel premises, added a walk-in freezer unit and air conditioning equipment, which latter gave them so much trouble that they had installed three additional towers to make the equipment work more efficiently. The trouble they experienced with bulbs burning out and fuses blowing on the hotel premises was, without dispute, attributable to their own overloading of the electrical wiring in the hotel. Without question, the trouble began within the hotel premises; and its own protective devices had operated to shut off all of the lighting within them; and the fire had been in progress some time before there was any arcing or flashing near or upon the wires of appellee.

From the whole record it is clear that appellants failed to introduce substantial evidence of negligence to make a case concerning which reasonable minds might reach different conclusions. They have produced no proof which tends to establish that any negligence on the part of the appellee caused the fire or contributed to its spread. In a long line of cases this Court has held that "speculation cannot supply the place of proof." Theriot v. Mercer, 1959, 262 F.2d 754, 759; Smith v. General Motors Corp., 1955, 227 F.2d 210; McNamara v. American Motors Corp., 1957, 247 F.2d 445; E. I. duPont De Nemours & Co. v. Kissinger, 1958, 259 F.2d 411, certiorari denied 359 U.S. 950, 79 S.Ct. 736, 3 L.Ed.2d 683; and Nashville Bridge Co. v. Ritch, 1960, 276 F.2d 171.

In this case no such proof was made and no circumstance points to the probability that further proof will be turned up. Substantially a year elapsed between the time of the fire and the beginning of this action, and two years between the time the action was begun and the time of its submission. The parties have developed their respective contentions by taking the depositions of both appellants and of all of the employees of appellee who had any knowledge of or dealings with appellants' and appellee's electrical installations at and near the damaged premises or of the facts attending the fire. Under these circumstances I think that the court below was justified in disposing of the case under summary judgment procedures in the manner and for the reasons set forth in Footnote 1 supra. Cf. Chambers & Co. v. Equitable Life Assurance Society of the United States, 5 Cir., 1955, 224 F.2d 338, 339;

Whitaker v. Coleman, 5 Cir., 1940, 115 F.2d 305; King v. California Co., 5 Cir., 1955, 224 F.2d 193; Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342; and Dyal v. Union Bag-Camp Paper Corp., 5 Cir., 1959, 263 F.2d 387.

I am not unfamiliar with the fact that there is a disposition on the part of some courts to rule summary judgment out as a remedy in negligence cases. I do not see any justification for such an attitude. Indeed, a large proportion of the cases coming before us involve negligence. If, from the depositions and affidavits placed before a court, it is clear that those claiming negligence have not proven it according to legal standards, I think that summary judgment ought to be entered in a negligence case to the same extent that it is in any other case.

Nor do I adhere to the concept sometimes found in court opinions that summary judgment ought to be denied because from the whole record it looks as if the party opposing it might be able to find some evidence to raise an issue of fact. On the other hand, I think it is clear from all of the authorities that the duty rests upon one against whom summary judgment is sought to bring forward competent proof developing an issue with the facts which have been adduced, under legal standards, by the person seeking summary judgment. The Rules themselves, in my opinion, make such an attitude mandatory.[4]

In this case both parties have "milked the cow dry." The case has been pending a long time. There is, in my opinion, no indication that the appellants can ever improve upon the testimony they placed before the court. In my opinion, the testimony justifies the granting of a summary judgment, and the opinion of the majority tends to emasculate the summary judgment rule as a mechanism for shortening the tedious proceedings by which justice is meted out. I therefore respectfully dissent.

---

4. E. g., Rule 56(c) providing in part:

"* * * The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(e) provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. * * *"

And Rule 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."